PAYETTE–BOISE WATER USERS' ASS'N, Limited, v. COLE et al.

(District Court, D. Idaho, S. D. July 21, 1919.)

No. 640.

1. WATERS AND WATER COURSES ☜222—CHARGE AGAINST LAND WITHIN RECLAMATION PROJECT TO BE FINALLY DETERMINED BEFORE CONSTRUCTION.

Under Reclamation Act June 17, 1902, § 4 (Comp. St. § 4703), providing that the Secretary of the Interior may let contracts for the construction of a project and thereupon shall give notice of the lands irrigable, the limit of area per entry, and of the charges which shall be made per acre upon such entries, which shall be determined with a view of returning to the reclamation fund the estimated cost of construction, the cost is to be estimated and apportioned before construction, and in case of settlement under such conditions the price cannot be later increased, though the published estimate is insufficient to cover the actual cost.

2. WATERS AND WATER COURSES ☜222—ESTIMATE AND APPORTIONMENT OF COST OF RECLAMATION PROJECT WAIVED, WHERE IT WAS AGREED THAT SETTLERS WOULD REIMBURSE GOVERNMENT FOR ACTUAL COST.

The requirement of Reclamation Act June 17, 1902, § 4 (Comp. St. § 4703), that the cost of a project shall be estimated and apportioned before construction, may be waived by settlers and the Secretary of the Interior, and was waived where there was no formal compliance with such requirement and all parties understood that ultimately the settlers would reimburse the government for its actual and necessary outlay.

3. WATERS AND WATER COURSES ☜222—SETTLERS ON RECLAMATION PROJECT CONSTRUCTED UNDER MUTUAL UNDERSTANDING THAT SETTLERS WOULD REIMBURSE GOVERNMENT WERE CHARGEABLE ONLY WITH ACTUAL COST.

Where, instead of estimating and apportioning the cost of a reclamation project before construction, it was mutually understood that the settlers would reimburse the government for the actual cost, they were chargeable with the actual cost only, and the Secretary of the Interior was without discretion in fixing the charge.

☜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

4. WATERS AND WATER COURSES ⊜222—COST OF RECLAMATION PROJECT CHARGE-
ABLE AGAINST SETTLERS MATTER FOR JUDICIAL DETERMINATION.

Where a reclamation project was constructed under a mutual under-
standing that settlers would reimburse the government for the actual cost,
the actual cost of the project was a matter for judicial investigation and
determination.

5. WATERS AND WATER COURSES ⊜222—DIRECTORS OF ASSOCIATION OF WATER
USERS OF RECLAMATION PROJECT AUTHORIZED TO RELEASE IRRIGATION DIS-
TRICTS FROM OBLIGATION TO TAKE WATER.

Where irrigation districts subscribed for stock in an association of wa-
ter users on a reclamation project entitling them to water, the board of
directors and the Secretary of the Interior *held* authorized to release the
irrigation districts from their subscriptions and obligations to take water.

6. WATERS AND WATER COURSES ⊜222—MEMBERS OF WATER USERS' ASSOCIA-
TION OF RECLAMATION PROJECT BARRED BY LACHES FROM ATTACKING RELEASE
BY DIRECTORS.

Where an irrigation district subscribing to stock in an association of
water users on a reclamation project was released from its obligations by
the association's board of directors, and though the other subscribers
learned thereof within a reasonable time no action to set aside the release
was brought for several years during which the district landowners ceased
to exercise any rights as stockholders and were not recognized as such,
and the district issued bonds by means of which it procured other water,
and lands in the district were bought and sold and transfers thereof
made, the members of the association were chargeable with laches pre-
venting them from attacking the release in equity.

7. WATERS AND WATER COURSES ⊜222—COST OF RECLAMATION PROJECT HELD
TO EMBRACE CERTAIN DRAINAGE WORK.

Where a reclamation project was constructed under a mutual under-
standing that the actual cost should be charged against settlers, the cost
of drainage work done for the benefit of lands in the project, or to protect
other lands from conditions resulting from the construction and operation
of the project, was chargeable against the project lands.

8. WATERS AND WATER COURSES ⊜222—SETTLERS ON RECLAMATION PROJECT
PAYING GREATER PRICE TO COVER FAILURE OF OTHERS TO TAKE WATER EN-
TITLED TO ADDITIONAL WATER.

Where landowners within a reclamation project outside of an irrigation
district are charged $80 per acre, while those within the district are
charged only $70, because of the possibility that all those outside the dis-
trict will not take water, those paying such higher price are entitled to
the additional service for which they pay, and, if seven-eighths of the
acreage takes water, they are entitled to the water rights for the entire
acreage.

9. WATERS AND WATER COURSES ⊜222—REQUIRING GRANT OF RIGHTS OF WAY
AS CONDITION FOR OBTAINING WATER FROM RECLAMATION PROJECT HELD UN-
LAWFUL.

Settlers on lands within a reclamation project could not be required as
a condition of obtaining water to make a floating grant in perpetuity, not
only to the government but to its successors in control of the project, of
rights of way for the construction, maintenance, and operation of ditches,
canals, flumes, etc., even though the patents for the lands were issued
prior to Act August 30, 1890, requiring patents to reserve a right of way
for the ditches or canals constructed by the United States.

10. WATERS AND WATER COURSES ⊜222—APPLICATION FOR WATER UNDER REC-
LAMATION PROJECT TOO INDEFINITE.

An application for water for land in a reclamation project, providing
that the measure of the water right was that quantity of water which
should be beneficially used for irrigation, not exceeding the share propor-

⊜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

tionate to irrigable acreage of the water available as determined by the project manager or other proper officer during the irrigation season for the irrigation of lands under the land unit, did not authorize the project manager or other officer to decide whether a landowner needed water, but only to determine the amount of water actually available, but was too indefinite, and landowners could not be required to execute it as a condition of obtaining water.

11. WATERS AND WATER COURSES ☞222—SECRETARY OF INTERIOR NOT VESTED WITH UNLIMITED POWER TO DETERMINE CONDITIONS OF PURCHASE OF WATER FROM RECLAMATION PROJECT.

Whatever may be the extent of the discretion of the Secretary of the Interior in the case of a reclamation project, where the charge for water and conditions of purchase are announced in advance of construction as required by statute, he could not exercise unlimited power to determine the conditions on which water would be supplied, where the project was constructed under the mutual understanding that landowners might procure water by paying their ratable proportion of the cost of construction and submitting to other equal and reasonable conditions.

12. WATERS AND WATER COURSES ☞222—RIGHTS OF LANDOWNERS ON RECLAMATION PROJECT STATED.

Where a reclamation project was constructed with the mutual understanding that settlers would reimburse the government for the actual outlay, and contracts had been made to supply irrigation districts and others with water, settlers were entitled to some authoritative description of the property to which their rights related, and a definition of the extent of their interest in the project, before they could be required to pay and to have from an authoritative source and of record a declaration of the cost of the project and of the portion of which it was intended they should become the beneficial owners, and could be required to pay the cost only of such portion of the works, or such interest therein as was set apart for the use of their lands.

In Equity. Suit by the Payette-Boise Water Users' Association, Limited, against D. W. Cole and others. Entry of decree deferred.

J. B. Eldridge, of Boise, Idaho, and H. A. Griffiths, of Caldwell, Idaho, for plaintiff.

J. L. McClear, of Boise, Idaho, Will R. King, of Washington, D. C., and B. E. Stoutemyer, of Boise, Idaho, for defendants Cole, Fisher, and Weinkauf.

Thompson & Bicknell, of Caldwell, Idaho, for Riverside Irr. Dist. and Pioneer Irr. Dist.

Hugh H. McElroy, of Boise, Idaho, for Nampa & Meridian Irr. Dist.

DIETRICH, District Judge. The suit relates to the Payette-Boise reclamation project, near Boise, Idaho, an enterprise undertaken by the government about 1906, under the provisions of the Reclamation Act and amendments thereto (32 Stat. 388, 33 Stat. 706, 33 Stat. 1032, 34 Stat. 116, 34 Stat. 519, 36 Stat. 592, 36 Stat. 835, 36 Stat. 902, 36 Stat. 917, 36 Stat. 925, 37 Stat. 265, 38 Stat. 686 [Comp. St. § 4700 et seq.]). The individual defendants are the manager and other local officers of the project, and the corporations are irrigation districts organized under the state laws. The plaintiff is a corporation organized by the settlers upon the project, at the request of the Reclamation Service, with general authority to represent and act for the

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

settlers or water users.   In respect to parties and in certain other particulars, the case is closely analogous to Magruder v. Belle Fourche, etc., 219 Fed. 79, 135 C. C. A. 524, to which resort may be had for a more detailed explanation especially of the organization and functions of the plaintiff company.   The provisions of law most directly involved are found in section 4 of the original Reclamation Act (June 17, 1902 [Comp. St. § 4703]), which is as follows:

"That upon the determination by the Secretary of the Interior that any irrigation project is practicable, he may cause to be let·contracts for the construction of the same, in such portions or sections as it may be practicable to construct and complete as parts of the whole project, providing the necessary funds for such portions or sections are available in the reclamation fund, and thereupon he shall give public notice of the lands irrigable under such project, and limit of area per entry, which limit shall represent the acreage which, in the opinion of the Secretary, may be reasonably required for the support of a family upon the lands in question; also of the charges which shall be made per acre upon the said entries, and upon lands in private ownership which may be irrigated by the waters of the said irrigation project, and the number of annual installments, not exceeding ten, in which such charges shall be paid and the time when such payments shall commence.  The said charges shall be determined with a view of returning to the reclamation fund the estimated cost of construction of the project, and shall be apportioned equitably."

The precipitating cause of the present litigation is doubtless a notice published by the Secretary of the Interior on July 3, 1917, purporting to be the notice authorized by this section that the settlers would be required to pay, as the cost of their water rights, at the rate of $80 per acre.   Many of the plaintiff's stockholders or members had been irrigating their farms from the partially completed system for several years, and, it appearing that water would be furnished for the season of 1918 only to those who executed applications by which they consented to pay such price and agreed to certain other conditions therein expressed, plaintiff, acting upon behalf of the water users, filed its bill to restrain the officers from enforcing the requirement. Certain temporary injunctive relief was granted, but that is no longer of importance for the cause is now submitted upon the merits.

Questions of jurisdiction and of the capacity of the plaintiff to maintain the action have heretofore·been ruled adversely to the defendants, and I am not disposed again to consider them.   Identical issues were raised in the Belle Fourche Case, and with the conclusions there reached and heretofore stated I am content.

The principal question both of law and of fact relates to the justness of the charge for water rights.   In considering it we must, of course, recognize the rule that, in so far as the action of the Secretary in establishing the price involves the exercise of a discretion conferred upon him by law, it is not subject to review in the courts.

The first and most sweeping contention of the plaintiff is that upon July 2, 1917, the Secretary was wholly without power to establish rates, for the reason that the time had passed for taking such action, and further that the authority conferred by law, especially by section 4, above quoted, had been once exercised and was functus officio.   It urges that under this section the cost is to be estimated and public notice of the apportionment thereof given before the construction

of the works and settlement upon the land, and not after, and that it is the "estimated" rather than the "actual" cost which is to be returned to the reclamation fund.

The project was first set on foot in 1904 and 1905, and construction work was carried on more or less continuously from 1906 up to 1917. The original plans were altered from time to time and certain units were added and others abandoned. In 1917 the system as finally decided upon was substantially complete. Many settlers went upon the public lands included in the project as early as 1905 and 1906, made improvements thereon, and procured title thereto under the provisions of the act. A full supply of water for some of the lands and a partial supply for others has been furnished from the system, though incomplete, for a number of years. One of the claims of the plaintiff is that in the earlier years, especially in 1904, 1905, and 1906, representations were made by officers of the government to owners of land within the contemplated project, and to prospective settlers upon the public lands embraced therein, that the cost would not exceed $25 or $30 per acre, and that these representations, considered together with the proceedings before and taken by the Secretary in letting the first contract, constitute the "estimate" and "public notice" authorized by the statute. The evidence upon this issue took a wide range, and I do not attempt to set forth a detailed analysis; in the main ultimate conclusions must suffice.

[1] But first as to the law: Generally speaking, it is thought that plaintiff's construction of section 4 of the act is correct. The primary purpose of the law, of course, is to secure the settlement and reclamation of arid public lands. In its administration the first step is an investigation for the purpose of determining the feasibility of a proposed project. Such investigation necessarily involves some consideration of the probable cost, but apparently Congress was not content to have the Secretary base his estimate upon the opinion of engineers alone; he is first to let contracts for construction, and then he is to estimate the probable cost, and equitably apportion it to the lands to be reclaimed. Of this estimate and apportionment he is to give public notice, and thereupon prospective settlers may determine for themselves whether they will or will not settle upon the lands, and thus bind themselves to pay the published price for water. In case of settlement under such conditions, it is incompetent for the Secretary to increase the price at a later date, even if it turns out that the published estimate is insufficient to cover the actual cost.

[2] Admittedly, there was no formal compliance with this provision of the law in the present case, but it is the plaintiff's contention that certain acts and statements done and made by the Secretary of the Interior and representatives of the Reclamation Service are to be deemed to constitute a substantial, though informal, compliance; and further, as an alternative position, that, it having been the duty of the Secretary to make and publish his estimate before commencing construction, he must now make the estimate as of such time, basing it upon information then available, and accordingly that the highest possible price which in reason he could establish would be $30 per acre.

Neither view is thought to be tenable. The evidence wholly fails to establish the claim that the statements and acts of the government officials were intended or understood to be final or binding upon the government. By an overwhelming preponderance of the circumstantial as well as the direct evidence, I am convinced that it was generally understood that the settlers would be required to pay the actual cost, whatever that might turn out to be. Without doubt in the beginning the belief prevailed that the cost would not exceed $30, and many, it may be assumed, relied without question upon the tentative estimates which were widely published in cultivating sentiment favorable to the undertaking. Neither have I any doubt that to many, if not most, of the settlers, the announcement by the Secretary in 1917 of $80 per acre came as a great surprise. But we are concerned, not with the hopes and disappointments of the parties, but with their mutual understandings, and it is impossible to explain the conduct of the plaintiff's officers and of the representatives of the Reclamation Service, except upon the theory that all parties understood that ultimately the settlers would reimburse the government for its actual and necessary outlay.

The Arrowrock dam was not thought of until long after the project was undertaken, and, of course, its cost in no wise entered into the computation upon which the earlier estimates were based. It is inconceivable that the construction of this new feature, which was to add so much to the efficiency of the service, would have been urged by the farmers or undertaken by the Reclamation Service at an estimated cost approximately equal to that of the rest of the system, but for the assumption that those for whose benefit the work was to be done would make reimbursement for the outlay. Both expressly and by implication the written agreement of February 13, 1906, between the plaintiff and the Secretary of the Interior, strongly militates against the plaintiff's contention. In short, from all the evidence I find that the understanding, in substance, was that the provision of the act requiring the estimate to be made before commencing construction work and before settlement would be waived, and that the settlers would pay the actual cost when and after that should be determined, instead of the estimated cost to be determined by the Secretary in advance. And no reasons are apparent why we should decline to give effect to such an understanding. True, the Secretary acts in a representative capacity, and his duties are prescribed by statute. So both parties are bound by the law—but only by the mandatory or substantive provisions thereof. Procedural directions intended for his benefit, the settler may waive, and in such waiver the Secretary may acquiesce, so long as the interests of the government are not prejudiced.

As already indicated, the basic principle of the law is that the settler shall pay the cost of what he gets, and, reciprocally, shall get that for which he pays. Under the prescribed procedure, this ideal is not likely to be perfectly realized, especially in respect to any given project considered by itself. The actual cost will rarely, if ever, precisely correspond to the estimate; an approximation is all that can be expected. Hence, in agreeing to dispense with a preliminary estimate and to

await the disclosure of and abide by the actual cost, the parties, while deviating from the law in a matter of procedure, were taking a course by which they would more perfectly work out its purpose. They will therefore be held to the agreement express and implied, relying upon which the government upon the one hand built the system, and the settlers upon the other entered, reclaimed, and improved their lands.

[3, 4] The settlers must pay the actual cost; but only the actual cost. Emphasis is appropriately laid upon this proposition, for the reason that while not openly repudiating the written contract or controverting facts implying such an understanding as it evidences, and while for certain purposes invoking both the written contract and the implied understanding, both parties have consciously or unconsciously at times assumed that their rights are in the main such as they would have been had there been no agreement and had the statutory procedure been strictly followed. Obviously, if, as we have found, both parties acted upon the understanding that the obligation of the settlers would be to reimburse the government for its actual outlay, the Secretary is now without discretion touching that matter. Granted that though the settlers were to pay the cost, it was for him, and for him alone, in the absence of an agreement to the contrary, to determine from time to time what work should be done and in what manner and at what cost, and that the settlers cannot now be heard to question the wisdom of expenditures actually made in good faith, still they are entitled to know what these actual expenditures were, and to be charged with nothing else. Had the Secretary seen fit to follow the statutory course, his preliminary estimate would not have been subject to private inquiry, for no private interest, would have been involved. In such a case the prospective water user, knowing beforehand what he must pay for a water right, could either take it or let it alone. But as we have seen, the conditions here are radically different. People entered lands and spent their money in reclaiming and improving them, in reliance upon the understanding that they would get their water rights at actual cost, not at such price as the Secretary might estimate, or, in the exercise of a wide discretion, might establish as being reasonable. It is no longer a question of what one party or the other may estimate the cost to be; subject to certain qualifications which will be considered later on, the time for estimates is past, for when the suit was commenced the project was an accomplished fact, and a detailed statement of the precise cost thereof should have been readily available to all concerned. The exact intent of the law, as well as the agreement between the parties, can now be carried out, by resorting to the figures of actual, rather than estimated, cost.

No ground for the contrary view is to be found in the contract of February 13, 1906. By the first clause of paragraph 5 (the language chiefly relied upon by defendants), the plaintiff "guarantees the payments for that part of the cost of the irrigation works which shall be apportioned by the Secretary of the Interior to its shareholders." It is that part of the "cost," not of an "estimate," which the Secretary may apportion. If any light were needed to make the meaning plain, it could be had by referring to the preceding paragraph, which pro-

vides that the charge for water rights "shall be divided into not less than ten equal payments, * * * and that the cost of said proposed irrigation works shall be apportioned equally per acre among those acquiring such rights." In short, there is nothing in this agreement suggestive of estimated cost, or of anything other than cost—actual cost. Within the legitimate scope of the agreement, both parties are upon the same footing, and their rights and obligations as defined by the contract are to be measured by the principles and rules which apply to parties contracting together in a similar manner touching subjects of more common cognizance. Under their agreement, the power to declare the actual cost of the project was committed to neither party, and, in the case of a controversy, the question, like other questions of fact affecting the relative property rights of contending parties, is for judicial investigation and determination. Moreover, aside from the contractual relation of the parties, the contention so strenuously pressed by the defendants, that the action of the Secretary is wholly exempt from judicial review, would seem to be inconsistent with the concession they make that, where administrative acts affect private rights, they are subject to revision in the courts in cases of fraud or an erroneous application of the law. For if, as is further urged, the officer cannot be interrogated and there can be no inquiry into the reasons for the official act, or discovery of the facts upon which it was based, how could the courts exercise their conceded power to correct errors of law and to give relief in cases of fraud? For example, the plaintiff asserts that in the aggregate cost taken as the basis for computing the acreage charge, the Secretary included general administration expenses. In Swigart v. Baker, 229 U. S. 727, 33 Sup. Ct. 645, 57 L. Ed. 1143, there is an expression apparently to the effect that such expenses cannot properly be included in the construction cost, so that, in the most favorable view to the defendants, the legal status of such an expense is in doubt. But if, as is here the case, the project records and books of account may be kept in such a manner as not to disclose what is and what is not a construction expenditure, and if the Secretary may fix the acreage charge without announcing or making a record of what is deemed to be construction cost, either by items or in the aggregate, and if he cannot be required to disclose what factors he considered, the courts would be powerless to exercise the jurisdiction which it is admitted they possess. When the record here is understood, it will appear to be little to the point to cite cases, involving questions growing out of the administration of the public lands, where the familiar rule is recognized that the courts will accept as conclusive the findings of fact by the land department upon conflicting testimony. Even in such cases the courts unhestitatingly exercise the right to review the record for the purpose of determining whether there is any evidence to support the findings and whether in decisions based thereon there was a misapplication of the law, and it is the power here to make such inquiry that the defendants question. It will be time enough to decide whether the Secretary's findings of fact are subject to review when he makes such findings and we know what they are.

[5] Before taking up the cost of the project and the apportionment

thereof to the plaintiff's stockholders and other water users, as provided in the public notice of July 2, 1917, it is expedient that consideration be given to certain transactions which, though in a measure relied upon by plaintiff as independent grounds for relief, indirectly affect the main inquiry. Three of the defendants, Riverside Irrigation District, Pioneer Irrigation District, and the Nampa and Meridian Irrigation District, are public corporations organized under the laws of Idaho, for the purpose of providing irrigation facilities for the owners of lands within their territorial limits. Within the boundaries of each district, when the project was set on foot, there were both irrigated and unirrigated lands. The water rights for the irrigated lands were inadequate during at least a part of the irrigation season, and the owners thereof joined in encouraging and promoting the project, with the expectation that through it they would be able to procure the desired supplemental supply of water. Accordingly, a plan was agreed upon by which they were to be put upon the same footing with other settlers and were to pay the same price for water rights, subject to a credit, however, of the appraised or agreed value of the rights of which they were already possessed. With that understanding, many of them bound themselves to purchase water rights by becoming subscribers for stock in the plaintiff company. Just why originally the districts as districts were brought into the transaction is not very clear; it is sufficient to say that in 1906 each of the districts, the Pioneer on April 3d, the Riverside on July 16th, and the Nampa and Meridian on October 12th, entered into written contracts with the plaintiff, by which it was agreed that the landowners subscribing for the plaintiff's stock should be credited at the rate of $14 per acre upon the project charge for water rights, whatever that might turn out to be.

And so the matter stood for several years, the landowners resting under their obligations as subscribers for the plaintiff's stock to purchase water rights upon the terms stated. But when, as construction work progressed, it became evident that rights would cost greatly in excess of what was at first anticipated, and when, as may be fairly inferred, these landowners became convinced that their requirements were less than was originally thought, they sought to withdraw from their obligations. In the case of the Riverside District there was the additional consideration that in 1910 it was very uncertain when, if ever, the project would furnish the water required, and another way had opened up by which the district could supply its needs. Accordingly, a petition was presented to the Secretary of the Interior by the landowners praying that they be relieved from their obligations to take water, and upon January 10, 1910, the plaintiff's board of directors passed a resolution (ratified and confirmed on February 8th, to cure certain defects), approving the petition and recommending that it be granted, and in due course favorable action was taken by the Secretary.

The plaintiff now contends that its board was without the power to grant such a release, and that therefore the action taken was void, and such landowners are still bound and should have apportioned to them their share of the cost of the project. To what extent the other subscribers who are still members of the plaintiff company suffered by

reason of the transaction is not clear. It is not contended that there is project water or canal capacity for which there is no demand. The only theory, therefore, upon which it could be held that they are injured, is that under the original arrangement the landowners in the district were in fact to pay more proportionately than the other settlers, and that the remaining subscribers have lost the advantage of a good bargain. Furthermore, neither the Secretary of the Interior nor the individual landowners whose interests the decree sought by the plaintiffs would affect, if real relief is to be granted, are parties, and their presence is apparently indispensable. But be that as it may, I am inclined to the view that upon the merits the plaintiff's contention should not be sustained. In the main it is predicated upon the doctrine of ultra vires as applied to attempts by corporation boards to release stockholders of subscribers for stock in ordinary corporations. The plaintiff is a corporation in a class quite by itself. Nominally the landowners became stockholders, and their contracts are stock subscriptions; but in reality the sole purpose of the whole scheme was, through an organization like the plaintiff, to provide a centralized representative with authority to act for the settlers. The real relation is between the settlers and the government, and the subscriptions for stock were in reality only agreements to purchase water rights. The releases, therefore, of certain landowners from their subscription contracts, were in effect releases from their obligations to purchase water. The plans for the project grew as the work progressed, and it was necessary that changes be made from time to time. New conditions arose which originally were not anticipated by any one, and much had to be left to the discretion of the Reclamation Service, especially in matters of detail. The original plans provided that water for the Riverside lands was to be furnished from the Payette river; but when this resolution was passed nothing had been done in constructing this unit, and in fact nothing ever has been done. Without a much larger reservoir capacity than was thought feasible in 1910, the supply in Boise river was insufficient. But if the Riverside landowners could be held to their contracts, it follows that reciprocally they had the right to demand water. In view of all of these considerations, it is thought that it was within the discretion of the Secretary of the Interior and the plaintiff's board to take the action complained of. There is no charge of fraud, and, as the facts were then understood, it cannot be said that the change of plan involved was improvident or was prejudicial to the interests of the other subscribers. With much reason it could have been argued that it was better for other subscribers to exclude the Riverside lands, and thus escape the obligation of developing the requisite water supply therefor, which apparently would be highly expensive.

[6] But were the contrary view to be taken, it must be held, I think, that the plaintiff and its other subscribers are chargeable with laches barring them from equitable relief. The other subscribers generally must have learned of the transaction within a reasonable time after it occurred. The Riverside landowners at once ceased to exercise any rights as stockholders or subscribers in the plaintiff company, and the

company ceased to recognize them as such. The Riverside District issued bonds, and by means of the proceeds thereof procured other water. Lands in the district have been bought and sold and transfers thereof have been made, and yet during all of the years from 1910 down to about the time this suit was commenced the validity of the release complained of was apparently never questioned, and no action was ever brought to set it aside. Manifestly, it would be impossible to restore the several parties and the property to the status existing in 1910, when the release was given. I have not overlooked the fact that in the earlier years the Riverside was a canal company only, and not a district; but in the view I have taken it is unnecessary to discuss the point.

The equitable considerations supporting similar releases of landowners in the Pioneer and the Nampa and Meridian districts, it must be conceded, are not so strong. These districts embrace lands easily within the range of the constructed unit of the project system, and the releases were executed at a time when water was known to be available. The circumstances are these: As time went on, ground water from deep percolation on irrigated lands of the valley, including those upon the project and within the districts, became a serious menace, making it necessary to provide extensive drainage facilities. For such purpose co-operation between the several organizations was highly desirable, and accordingly, after considerable negotiation, contracts were entered into by the government with the two districts severally, the plaintiff joining therein. The Pioneer contract was executed February 27, 1913, and upon June 15, 1915, was modified by a supplemental agreement. The Nampa and Meridian contract bears date June 1, 1915. Both contracts cover the subjects of drainage and a supplemental supply of water for the irrigated lands of the districts. In each there is a provision for the construction by the government of a drainage system to serve both project and district lands, with an apportionment of a part of the cost thereof to the district, and an agreement by which the government is to sell and the district is to buy at a stipulated price a certain portion of the storage water held in the Arrowrock reservoir; delivery thereof to be made in the river at the dam. By appropriate resolution, the plaintiff's board authorized its officers to join, and they did join, in the execution, more particularly for the purpose of assenting to the provision thereof rescinding the 1906 agreements establishing the value of the old water rights at $14 per acre, and releasing subscribing landowners in the districts from their contracts individually to purchase project rights.

It will be observed that, in so far as it is a question only of the power of the plaintiff's board to assent to the release of the subscribing landholders from the obligations of their contracts, the two transactions are not essentially different from that in the case of the Riverside district. In point of wisdom or business prudence, it is to be conceded the action taken does not so readily commend itself; but still it was within the scope of the board's authority, and it is not for us to weigh the considerations for and against, for the purpose of determining whether it was provident or improvident. In brief, therefore, upon this

branch of the case, it is concluded that the subscribers so released in these irrigation districts are not chargeable with a ratable proportion of the cost of the project.

[7] Conveniently in this connection disposition may be made of one branch of the contention in regard to construction charges for drainage. The cost of work done for the benefit of the project lands, or for the purpose of protecting other lands from conditions resulting from the construction and operation of the project system, is plainly chargeable against project lands. As to whether such cost was reasonable, or whether in a case where there was co-operation between the Service and a district, in the construction of a joint drain, for the benefit of both parties, there was an equitable apportionment of the construction cost, we do not inquire. There is no charge of fraud or bad faith, and by its contract of 1906 with the Secretary the plaintiff impliedly intrusted such matters to his judgment and discretion. The question whether, in fixing the charge per acre for water rights, the Secretary included any item for drainage not incident to the project, is deferred for later consideration.

Returning now to the principal inquiry: If, as we have found, the understanding was that the settlers were to pay the actual construction cost, and if, as was expressly stipulated in the contract of February 13, 1906, the cost is to "be apportioned equally per acre," obviously two prime factors enter into the computation of the just charge to be made for water rights, the total cost of the project and the number of acres to be irrigated. But chiefly because of the defendants' assumption that the charge per acre is a matter exclusively within the discretion of the Secretary and that any action he may take is beyond the range of judicial inquiry, these factors are left in great obscurity. The official records are inadequate, and the Secretary, apparently the only officer qualified to testify, while submitting to interrogation, failed to give the requisite additional information. No record of any character appears to have been made of the Secretary's findings if any he made, upon which presumably his public notice was based, and for some unexplained reason the public notice, while containing a declaration of the cost of the Arrowrock dam, is silent touching the cost of any other feature or of the project as a whole. True, the books in the office at Boise and at Washington disclose the expenditures which have been made by the Reclamation Service in this part of the state, but there is no segregated construction account covering fully and exclusively expenditures upon the project. Consequently, upon resort to these records, items are found which clearly relate to the project, and others which are quite as clearly not chargeable against it, and still others of doubtful status. In short, we are advised by no record of any kind what the Secretary assumed to be the cost of the project, or what capital items of expenditure as shown by the books he deemed to be chargeable, and what items, if any, he rejected. True, counsel for the defendants, apparently appreciating the strain in this branch of the case, offered the testimony of officers and employés of the Reclamation Service touching the actual cost, exclusive of items of expenditure conceded not to be chargeable against the project, and

also offered certain documents and reports which it is claimed were accessible to the Secretary before and when the public notice was prepared. But upon the other hand, with forceful argument, they objected to the plaintiff's efforts to discover what the Secretary did and what he found to be the cost, and what items of expenditures he held to be chargeable.

The record touching the acreage to be served is likewise indefinite and inconclusive. The public notice describes the lands as being in certain townships, and refers for a more specific description to what are designated as farm unit plats on file in the local land offices at Boise, Idaho, and Vale, Or. These plats, it appears, cover an aggregate of approximately 143,000 acres, 43,000 in the Nampa and Meridian Irrigation District, and 100,000 upon the outside. (There is a discrepancy in the record touching these figures, but the precise amounts are immaterial.) To this extent the facts would seem to be sufficiently disclosed by a record both permanent and accessible; but, while it is thus shown that the system is to be available for the irrigation of these lands, there has been no declaration, and there is no assurance, as to the extent of its availability for such purpose. Not to its full extent, the evidence conclusively shows, for the Reclamation Service has already contracted or proposes to contract to deliver to the Pioneer and other irrigation districts, for stipulated prices, various amounts of water stored in the Arrowrock reservoir, aggregating approximately one-ninth of its total capacity, and to stockholders of the New York Canal additional storage and canal capacity of the estimated value of $430,000, and there are suggestions in the evidence of plans for the further extension of the system to irrigate other large tracts of land not included in the 143,000 acres; but to what extent it is intended to burden the existing storage and distributing units for this purpose is not made clear. If then the settlers upon the 143,000 acres pay at the rate of $80 per acre, or an aggregate of approximately eleven and a half million dollars, what will they get?

The act plainly contemplates that, when the settlers reimburse the government for its construction outlay, they will be the beneficial owners of that for which they have paid, but with nothing of record to disclose for what they have paid, upon what can they base a claim to the ownership of any specific part of or interest in the system, or how could they protect themselves in the event of a threatened diversion to other uses of water which they need for the irrigation of their lands? Even in the case of the Arrowrock reservoir, the cost of which has been formally declared to be $4,750,000, they would be at a loss to establish their proportionate interest, for they would be wholly unable to prove what part of the $80 per acre is by the Reclamation Service deemed to be applicable to the cost thereof; and as to the other units their difficulties would be still greater, for there has been no announcement of their cost. Nor are the settlers assured of any specified service. A landowner's rights in an irrigation system are generally measured in one of two different ways. He either has an undivided interest, with the right to receive a ratable proportion of the water available, whatever that may be, or he is entitled to receive a specified

amount of water in acre or second feet. As we have seen, there is no record here upon which a settler who pays $6,400 for 80 acres of land can predicate a claim that he has any proportionate interest in either the reservoir or the distributing capacity of the system. Has he a guaranty of any specific amount of water service? The law furnishes none. It provides that the right to the use of water acquired under the act "shall be appurtenant to the land irrigated, and beneficial use shall be the basis, the measure, and the limit of the right." Comp. St. § 4707. But this is a declaration only of the familiar principle that a water right is dependent upon beneficial use, and that such use is the maximum measure of the right. We are here concerned with the minimum of the settler's enforceable demand, not his maximum right. Is there any limit below which delivery cannot be reduced without violating his right? What is his right?

It must be borne in mind that in its activities the Reclamation Service is not limited to projects which will furnish an adequate supply of water for full irrigation; a partial supply may be put to beneficial use and may be highly desirable, and whether a project will be undertaken which will furnish only a partial supply is a matter for administrative discretion. It follows that there is no representation or agreement to be implied from the mere fact that a project is undertaken that the settler thereon who pays the established acreage charge will have a full or adequate water right. Here the contract of February 13, 1906, provides for no specific amount. Paragraph 3 is to the effect that the "aggregate amount" of water rights sold "shall not exceed the number of acres of land capable of irrigation," by means of the water supply available, and that the Secretary "shall determine the number of acres so capable," "his determination to be made upon due and expert considerations of all available data, and to be based upon and measured and limited by the beneficial use of water." But whether we construe this obscure passage as a guaranty of a full and sufficient right for all land to be irrigated, with authority in the Secretary to determine the duty of water, in the manner provided, or as providing that only such acreage shall be included as is capable of, and will be benefited by, irrigation, it is without any important bearing at the present juncture, for it is not contended, as I understand, that the Secretary has exercised such authority—whatever it may be—at least, not in such a manner as to conclude the government and give reliable and permanent assurance to the settlers. Obviously, if a high duty is given to the available water supply, a greater acreage will be served, and the acreage charge will necessarily be less than in the case lower duty is established. Nor does the public notice of July 3, 1917, contain any guaranty, except in the case of the stockholders of the New York Canal, who apparently are assured of a certain measure of service.

Turning to the application which under the notice the settler is required to make, and which, when accepted, may be deemed to be a contract conclusive of all matters which it covers, we find a provision to the effect that the measure of the water right purchased shall be "that quantity of water which shall be beneficially used for the irrigation" of the lands, "but in no case exceeding the share, proportionate

to irrigable acreage, of the water supply actually available as determined by the project manager or other proper officer of the United States, or of its successors, in the control of the project, during the irrigation season, for the irrigation of lands under said unit." Here, plainly, the maximum of the right is carefully guarded by two limitations; one being the extent of beneficial use, of which, of course, there can be no complaint, and the other the amount of water actually available for the unit. But there is no suggestion of a minimum limitation. If, therefore, enough is realized from the acreage charge of the 143,000 acres fully to reimburse the government for its entire outlay, and if the full capacity of both the reservoirs and the distributing system is required for the proper irrigation of this acreage, still upon what theory of legal right could the settler object if half the capacity were devoted to supplying privately owned lands in the districts and other units still to be developed? As the record stands, if he signs the application he will have contracted for no specific interest in the system or any unit thereof, and no specific or minimum water service. His only right will be to demand a "share, proportionate to the irrigable acreage, of the water supply actually available   *   *   *   for the irrigation of lands under" the unit embracing his land, and what water is available for that unit, and what water shall be devoted to other lands or units, is for the discretion of the project manager and other officers. Clearly there is no assurance that the settler will get that for which he pays.

It would seem that, even where the course prescribed by the statute is pursued and the cost is estimated and the acreage charge announced in advance of construction, there should be a record describing the area to be irrigated and specifying the works which the settlers will have when they have paid the required charge; otherwise, the Reclamation Service could do much or little and still demand full payment of the charge. But here, where in effect the settlers said to the Reclamation Service to go ahead and construct a system and they would reimburse the government for its actual outlay, the reasons for definitely and conclusively advising them what they are paying for and will have are even stronger; plans have become physical realities, and that which was contingent has become certain. Contrast the condition of the settlers with that of the landowners in the irrigation districts. The Pioneer District perhaps is a typical case. For the use of its landholders it has entered into a contract for a supplemental supply of water to be delivered from the Arrowrock reservoir. It is to pay therefor the sum of $354,667, and for that consideration it is to be entitled to receive a definite, expressly stipulated portion of the water stored in the reservoir. In other words, the total cost of the reservoir is declared to be $4,750,000, and it will receive a supply of water bearing the same relation to the total supply of the reservoir as 354,667 bears to 4,750,000. Thus the farmers in this district are assured that at all times they will receive approximately one-thirteenth of all the water stored in the reservoir. The settler, upon the other hand, is assured only of a ratable portion of such water in the reservoir as some officer may from time to time determine is available for the 143,000 acres of

land or some part thereof; that is, of such supply as may remain after dividing up the total supply with a number of irrigation districts with which contracts have been or are to be made, and with the New York Canal stockholders, and with possible new units still to be developed.

It is not fanciful to suggest that the availability of the system for supplying the 143,000 acres may be indefinitely reduced. The record speaks, not only of existing and proposed contracts for furnishing water, but it also strongly intimates that in some quarters at least it will be contended that the charge fixed by the Secretary is not sufficient to return to the government its entire outlay, and that it will be necessary to extend the service to other units to make up the deficit, and plans have already been formulated for at least one such extension. When is there to be an end, and what fractional part of the system will be left for the 143,000 acres of land? Why not put these settlers upon an equal footing with the holders of privately owned lands, and advise them of the cost of that for which they are asked to pay, and assure them of what they will have when they have fully paid the consideration? Such a course it is thought the act plainly implies and all parties contemplated when the project was undertaken. To exact from the settlers the execution of the proposed application would be to require them to agree to pay a definite, fixed sum for something the cost of which is not known and the value of which may be changed and reduced from time to time at the will of the other party to the transaction. It is not thought that they can be lawfully required blindly to enter into such an undertaking. That for which they pay should be as clearly defined as that which they pay, either by the express terms of the application or by apt reference to an accessible, permanent record. Manifestly, until it is known what interest or right in the system the settler is to get, there can be no intelligent appraisement of the amount he should pay in satisfaction of his undertaking to reimburse the government for the actual cost, and consideration of that question must be deferred.

[8] The plaintiff also complains of a provision in the public notice under which the charge against the 100,000 acres of land outside the Nampa and Meridian District is fixed at the rate of $80 per acre, while similar lands in the district are required to pay only $70. The precise provision is as follows:

"If within one year from the date of this notice all of the irrigable lands of the Boise project shown on said farm-unit plats are duly pledged in accordance with law and the regulations of the Secretary of the Interior, to return the payment of the construction and operation and maintenance charges, either through individual contracts, water users association contracts, or through irrigation districts duly organized and confirmed by judicial decree, then the said construction charge of $80.00 per irrigable acre will be reduced to $70.00 per irrigable acre."

It appears that prior to the issuance of the notice, namely, by the contract of June 1, 1915, between the Nampa and Meridian Irrigation District and the Secretary (the plaintiff joining in the execution thereof for certain purposes), the government agreed to deliver to the district the full amount of water which all the project lands therein, aggregating about 43,000 acres, will be entitled to receive, the basis of

delivery per acre to be the same as that for other project lands; and in turn the district was to apportion the charge therefor at the rate of $75 per acre, or a total of $3,304,500, to such project lands, and in due time collect the same in the manner provided by law, and pay the money over to the Reclamation Service. There was the further stipulation that if the Secretary, by his public notice, should establish a lower charge for similar project lands outside the district, the amount to be thus apportioned and collected should be correspondingly reduced, and accordingly, under the provision of the public notice above quoted, the charge is now understood to be at the rate of $70 per acre instead of $75. The plaintiff contends that the transaction amounts to an unjust discrimination. As has already been observed, the contract of February 13, 1906, expressly declares that the cost of the works "shall be apportioned equally per acre"; and besides it is not contended that the lands in the district are substantially unlike those on the outside. The records of the Reclamation Service fail to disclose why such a distinction was made, and necessarily therefore the actual reasons are left to conjecture. A possible, and the only plausible, explanation is that it was thought that if left to the voluntary action of individual settlers there would be no applications for a considerable acreage, and hence fully to reimburse the government it would be necessary for the lands taking water rights to bear a larger acreage charge.

It is also suggested that some of the lands will probably become swampy, and consequently will not pay the acreage charge; but it is not shown that drainage is impracticable, and, as the notice plainly states, future drainage facilities may be provided for out of the maintenance fund. Within reasonable limits, it would seem entirely proper, in computing the area against which it is practicable to charge the cost of the project, to make an allowance for shrinkage due to the unwillingness or inability of the owners of some of the lands to purchase water rights. What allowance, if any, the Secretary made upon this account, does not appear; but if we assume as correct the only theory advanced by the defendants in explanation and justification of the distinction in acreage charge, namely, that because of the percentage of the 100,000 acres which will not take water rights, whatever may be the reason, the return from the remainder at $80 per acre will not exceed the return which the entire 100,000 acres would yield at $70 per acre, what view shall be taken of the rights and obligations of those who do purchase water rights? Upon the theory suggested, it follows as a matter of course that the Secretary found that, at the rate of $70 per acre for the entire 143,000 acres, the return would be sufficient fully to reimburse the government; for it will not be presumed that he failed to perform his duty by knowingly charging against the 43,000 acres in the district an amount less than the construction cost, or permitting the other 100,000 acres to escape a considerable part of the construction cost by the formation of irrigation districts as suggested in the notice.

If, therefore, according to the estimate on which the difference in rates is based, 87,500 acres out of the 100,000 take and pay for water rights at the rate of $80 per acre, the full construction charge for

the 100,000 will have been paid. The district is to receive water for the entire acreage for which it pays, namely, for 43,000 acres, and not 87½ per cent. of that amount, and by every consideration of equity should not the settlers upon the outside who are unable to organize also have the benefit of that for which they are compelled to pay, namely, water rights for the full 100,000 acres, and not merely 87½ per cent. thereof. If not they, who is to receive the benefit of the water rights for the 12,500 acres for which they will have paid to the government $875,000? Is the water represented thereby to be distributed gratis to all the users from the system, or is it to be resold, with the proceeds going to the government as a profit? Or, whether it is held or sold, are those who pay for it to be regarded as the beneficial owners? To ask the question is to answer it. Neither the government nor the other water users should be permitted to reap where they have not sown, and either in the public notice or in the application for water rights, or in some other conclusive manner, these people should be assured of the benefit of such additional charge as they may be fairly required to pay in order fully to reimburse the government for its outlay. Possibly, $10 an acre upon this account is excessive. That is a matter which may have further consideration.

[9] Objection is also made to one of the forms of application prescribed, because of the following provision:

"And I do hereby grant, bargain, sell, convey and confirm to the United States of America and its successors in charge of the project all rights of way for ditches, canals, flumes, pipe lines, telegraph and telephone transmission lines, or other structures now constructed by or under the authority of the United States for or in connection with the said project, and all rights of way that may be or become necessary and suitable and that may be required for the prosecution and operation of the said project, and for the construction, maintenance and operation of ditches, canals, flumes, pipe lines, telegraph and telephone transmission lines, or other structures that may be constructed by or under authority of the United States and its successors in charge of the project, for and in connection with said project."

Upon the record I am inclined to think that the portion which operates as a grant of presently occupied rights of way is within the spirit of the understanding which has prevailed between the parties during the construction period, and therefore may properly be required. The balance of the provision purports to be a floating grant in perpetuity, not only to the government, but to its successors in control of the project. Such a grant is inherently harsh, especially where it relates to lands which are to be improved. These farms are to be held in comparatively small tracts, and presumably are to be intensively cultivated and highly improved. Why hold over the owner the perpetual menace of injury incident to the cutting of a drainage or irrigation canal through his small holding, however highly improved it may be, at such a place as the person in charge of the project may see fit to select, and without compensation? The project is substantially finished, and if in time, for more efficient operation or more economical maintenance, it is thought desirable to add to or alter the works, why impose upon the single individual the burden of furnishing a right of way to be used for the benefit of the project as a whole? It is suggested that the paragraph

quoted is incorporated only in the form of application required from the owners of lands for which patents issued prior to August 30, 1890, the date of the act (26 Stat. 391), providing that thereafter it should be expressed in all patents that there is reserved from the lands patented "a right of way thereon for ditches or canals constructed by the authority of the United States," in order to put all lands upon the same footing. But in the first place it does not put all landholders upon the same footing; it effects a grant in excess of the scope of the statutory reservation referred to. This reservation is for rights of way for "ditches and canals"—nothing more—and only for ditches and canals "constructed by the authority of the United States," not by authority of private parties who may succeed to its interests. Moreover, no such burden at all is put upon the lands in the Nampa and Meridian Irrigation District, the owners of which are to secure the same water rights upon terms which in other respects are no more onerous. In the second place, patentees of land patented before August 30, 1890, acquired complete title; whereas, later patentees voluntarily assented to take title subject to the reservation. It is doubted whether rights thus vested can now be equalized by administrative act.

[10] Objection is further made to the following equivocal provision found in paragraph 2 of both forms of application, namely:

"The measure of the water right for said land is that quantity of water which shall be beneficially used for the irrigation thereof, but in no case exceeding the share proportionate to irrigable acreage, of the water supply actually available, as determined by the project manager or other proper officer of the United States, or of its successors in the control of the project, during the irrigation season, for the irrigation of lands under said unit."

Apparently, it is the contention of counsel for the plaintiff that this latter clause purports to authorize the project manager or other officer to determine the duty of water, that is, in any specific case and at any given time, to decide whether or not the landowner is in need of water, and, if so, how much water he reasonably requires. But in this view I cannot concur. The authority conferred is to determine the amount of water "actually available * * * for the irrigation of lands under said unit." The infirmity of the provision is its indefiniteness. If it be assumed that the reference to "said unit" can be made certain by an appropriate descriptive phrase entered into the blank left in the heading apparently for that purpose, by what rules, principles, or considerations is the officer to be guided in determining the amount of water available for such "unit"? There is no intimation in the application itself of what a unit is, or what relation it sustains to the project as a whole, or how, if at all, water is assigned or apportioned to it, and no standing rule or regulation is referred to. That being the case, how could the officer intelligently determine what water is available for the unit? If the unit is not entitled to all of the water in the system, then what part thereof, and why; and upon what basis is the water to be apportioned? The application executed and accepted constitutes a contract, and by its terms the rights and obligations of the parties are to be measured. But how could a court enforce a provision of this character, or protect a party in the enjoyment of the rights it

is supposed to confer? A settler should not be required to execute an agreement which is void for uncertainty.

[11] Relative to this and other features of the prescribed forms of application, it is urged upon behalf of the defendants that the settlers have no vested rights until their applications have been accepted, and it is therefore wholly within the discretion of the Secretary to determine upon what conditions he will accept an application, or whether he will accept any application at all. But whatever may be the extent of his discretion, in the case of a project where the charge and the conditions of purchase are announced in advance of construction, such unlimited power cannot be exercised at this time under the facts disclosed by the record. There is the contract of February 13, 1906, and there is the outstanding fact that aside from the contract both the settlers upon the public lands and the owners of arid private lands have been led to believe that they would be able to procure water rights by paying their ratable proportion of the construction cost and submitting to other equal and reasonable conditions. It is said that there is no direct proof of reliance by any particular settler or landowner upon such premises, express and implied; but the record is replete with evidence that such has been the general understanding, and a community has grown up, and government lands have been acquired and private lands improved, all in reliance upon the availability of the project for water for those who were willing to comply with such fair and lawful conditions.

While thus holding that the plaintiff is entitled to a measure of relief, I shall not presently direct the entry of final decree or prescribe the precise scope and form thereof. If the general considerations which I have deemed to be controlling meet with approval, there may be a disposition to obviate at least some of the objections to the form of the applications now required; it would not be strange if, in an adversary proceeding such as this, considerations have been presented which were overlooked in the routine of departmental administration, necessarily ex parte. The Secretary is not, at least in name, a party to the suit, and besides I have no disposition to direct just what action shall be taken or prescribe precise forms of application or in any wise to invade the province of administrative discretion. Entry of final decree will therefore be deferred for a reasonable time.

[12] To recapitulate, it is held: That by mutual understanding the parties waived the provision of the law authorizing the Secretary to estimate the cost in advance of construction, and agreed that the water users would reimburse the government for its actual outlay. That consequently the actual, rather than the estimated, cost is to be apportioned, and in determining this there is no room for the exercise of departmental discretion; it is a question purely of existing fact. That, while the settler must pay for what he gets, in turn he is entitled to get that for which he pays. That to the end that he may know for what he is paying, and that he may have reasonable muniments of his right and title, there must be some authoritative description of the property to which his right relates, and a definition of the extent of the interest in the project works of which he and all others of his class will be

263 F.—48

the beneficial joint owners when they have fully paid their obligations. That the 143,000 acres for which the acreage charge has been fixed can be required to pay the cost only of such portion of the works or of such interest therein as is set apart and held for the use of such lands, and, until such proportion or interest is decided upon and declared, it is impossible to determine the actual cost of the works for which the settler should pay, and hence impossible intelligently or justly to fix the acreage charge. That the settlers are entitled to have from an authoritative source and of record a declaration of the cost of the project as a whole, and of the portion of which it is intended they shall ultimately become the beneficial owners. That in principle the difference in acreage charge provided for in the public notice between the lands in the Nampa and Meridian Irrigation District and those on the outside does not necessarily constitute an unjust discrimination, but that, if such distinction is made, those who pay the additional cost per acre should be the beneficiaries of the additional service for which they pay. That the settlers cannot lawfully be required to execute the grant contained in one of the forms of application, for floating rights of way. That the grant of seepage and waste water, as provided for, is not unreasonable, if, as I construe the grant, it is for the benefit of the project as a whole, and not for the private profit of the grantee. That paragraph 2 of the application should be amplified for the purpose of greater certainty. That the cost of the Arrowrock dam is on the same footing as the cost of the distributing system, and is therefore presently chargeable against the lands. That the undertaking of the Penitentiary Canal was a matter for administrative discretion, and the cost thereof is to be deemed a part of the cost of the project. That the cost of drainage facilities for the benefit of the project or rendered necessary by reason thereof is properly chargeable; but not so of drainage works having no relation to the project. That the releases of subscribing landowners in the Riverside, Pioneer, and Nampa and Meridian Irrigation Districts were not void, and the plaintiff is bound by its assent thereto.

Entry of decree will be deferred until the September term, unless defendants move for an earlier disposition. In the meantime they may, if they so desire, upon notice, make a showing of what, if anything, has been done or will be done to meet the objections I have held to be valid. The injunctive order now outstanding reasonably protects the rights of the parties, and it will be continued in force until further order.