### PAYETTE–BOISE WATER USERS' ASS'N, Limited, v. BOND et al. (PIPHER et al., Interveners).

(District Court, D. Idaho, S. D. September 18, 1920.)

No. 640.

**1. Waters and water courses ☞222—Items entering into cost of government project.**

While administrative expenses of the reclamation service, such as salaries of the administrative officers and of those who assisted them in the performance of administrative duties, are not chargeable as part of the cost of a project, the cost of services rendered to that particular project, such as the keeping of its accounts, preparation of engineering specifications, or purchasing and forwarding supplies, whether such services are rendered at the place of the project or elsewhere, or for such project alone or in connection with others, in such case prorative, is properly chargeable as a part of its cost.

**2. Waters and water courses ☞222—Contested claim of contractor not chargeable to settlers in cost of government project.**

The amount of the claim of a contractor on an irrigation project, which is being contested by the government in the Court of Claims, cannot properly be charged to the settlers as a part of the cost of the project.

**3. Waters and water courses ☞222—Computation of acreage chargeable with cost of irrigation project.**

In computing the acreage on which the cost of an irrigation project was to be charged, a general deduction from the lands within the limits of the project of 10,000 acres, because it was "estimated" that such quantity would prove incapable of irrigation, because rough or sandy or from seepage, *held* not justified, where no land was described and excluded, and all lands within the project were equally entitled to water if demanded, and where specific tracts had already been excluded as nonirrigable.

**4. Waters and water courses ☞222—Rights of settlers within irrigation project may be judicially determined.**

Settlers on lands within an irrigation project, with the understanding that water shall be supplied to their lands and that the cost of the works will be assessed against them, are not concluded by the decision of the Secretary of the Interior as to what their interest in the works shall be, nor as to what sum shall be assessed against their lands for cost of construction, but have rights which may be judicially determined.

In Equity. Suit by the Payette-Boise Water Users' Association, Limited, against J. S. Bond and others. John Pipher and others intervened. On final hearing.

For prior opinion, see Payette-Boise Water Users' Ass'n v. Cole, 263 Fed. 734.

J. B. Eldridge, of Boise, Idaho, and H. A. Griffiths, of Caldwell, Idaho, for plaintiff.

J. L. McClear, of Boise, Idaho, Will R. King, of Washington, D. C., and B. E. Stoutemyer, of Boise, Idaho, for defendants Bond, Fisher, and Weinkauf.

Thompson & Bicknell, of Caldwell, Idaho, for defendants Riverside Irr. Dist. and Pioneer Irr. Dist.

Hugh E. McElroy, of Boise, Idaho, for defendant Nampa & Meridian Irr. Dist.

E. G. Davis, of Boise, Idaho, for interveners.

DIETRICH, District Judge. In the decision filed on July 21, 1919 (263 Fed. 734), certain conclusions were stated, but entry of decree in accordance therewith was deferred until the September term, in the thought that possibly the Reclamation Service might see fit in the meantime to obviate some of the objections held to be valid, and that progress could thus be made toward a solution of the controversy, without substantial delay or expense.

It will be remembered that the principal question in issue was the propriety of the demand of $80 per acre made against the settlers on certain of the project lands as a construction charge, and inasmuch as the Secretary of the Interior, the officer vested with final authority to speak for and bind the government, has failed to make findings, and, as a witness, was unable or unwilling explicitly to disclose the factors which he had used in his computation, the basis of the charge was in some respects left to conjecture. By all considerations of common fairness, it was thought the settlers were so clearly entitled to be advised from an authorized source, and in sufficient detail to enable them intelligently and fully to consider the correctness of the charge, that the absence of findings was assumed to have been the result of an oversight, rather than of design, and it was believed that, attention having been called to it, an appropriate record would be promptly supplied.

However that may be, of date October 24, 1919, the director and chief engineer of the service signed, and the Secretary approved, an instrument entitled "Statement of Cost and Conditional Dedication of Irrigation Works, Boise Irrigation Project, Idaho." And upon October 31st a certified copy thereof was, by leave of court, filed as an exhibit in the cause, and served upon counsel for the plaintiffs. (For convenience the instrument will be referred to as the statement.) Subsequently additional pleadings were filed, and certain settlers with interests in harmony with those of the plaintiff were permitted to intervene; and, further proofs having been taken, the cause is again submitted.

No direct issue was made in the original pleadings touching the interest which the settlers were to have in the system. In the statement, for the first time, the Secretary disclosed his position and informed them that upon the payment of the announced acreage charge of $80 for lands outside of, and $70 for lands within, an irrigation district, they would be recognized as being the owners of a one-half interest in the Arrowrock reservoir, 98 per cent. of the Deer Flat reservoir, and 99 per cent. of the diversion works and main canal, with a reservation, also, of the power plant at the diversion dam. In its supple-

mental complaint the plaintiff asserts the need for the entire capacity of the system, and challenges the Secretary's right to withhold any part of it, and thus we have substantially a new issue. For convenience we will first consider the propriety of the acreage charge, upon the assumption that the settlers are to have only such portions of the system as are so dedicated to their use.

In view of the conclusion heretofore reached, that the settlers must pay the actual cost of what they get, two prime factors enter into the computation of the proper acreage charge: (1) The cost of works of which the settlers are to be the beneficiaries; and (2) the acreage to be served thereby.

### Cost.

First, as to the cost of the project. By the statement it is shown that the net cost of the portions of the system (other than the Arrowrock storage) dedicated to the "project lands" (defined to be lands "under the constructed unit of the project and having no water right from private canals") is $6,788,233.18, and of one-half of Arrowrock, so dedicated, $2,300,591.91, or a total of $9,088,825.09. It is stated that this amount includes nothing on account of surveys and investigation for other projects, nothing for drainage expenditures, except for such drainage as serves the project lands, nothing for the Notus extension, and that it is net, after making deductions for the reserved features, namely, $195,305.27 for power plant, $20,000 for 2 per cent. of Deer Flat storage, and $20,000 for 1 per. cent. of main canal, which delivers the water from the river into the Deer Flat reservoir; the explanation being that this canal cost $2,000,000 and Deer Flat $1,000,000.

Plaintiff, stating the account by a different method, reaches a different conclusion; but upon analysis it is found that the difference in result is due to a comparatively few controverted factors, and in the interest of clearness and brevity these will be referred to, without any attempt to set forth in detail the account as stated by either side.

### Notus Extension.

One disturbing factor is the Notus extension; it having been excluded by the Secretary and taken into account by the plaintiff. It is not completed, and of course we cannot anticipate at this time precisely what the actual cost will be, and the acreage charge having been fixed by contract, the ultimate result may be a small profit or a small loss; neither is likely to be great. For such interests in the main canal and Deer Flat reservoir as are set apart for it, it is charged. True, no credit is given for the water developed by the drainage systems, which is its chief water resource, but only in part does such water come from project drainage systems, and besides, taking the equitable view, the plaintiff's shareholders and other settlers on the south side are charged nothing for the mere right to appropriate water. Accordingly it is thought that there was no impropriety in excluding from consideration both the cost of this extension and the acreage to be irrigated therefrom. Were the profit or loss likely to be very considerable, a different view might very well be taken.

269 F.—11

### Power Plant.

So with the power plant at the diversion dam. The installation was primarily for construction purposes, and it now has no utility, so far as concerns the maintenance and operation of the constructed units. If retained, it will be of value only for such revenues as may be realized from its rental or from the commercial sale of electric current. Credit is given for its cost, and apparently some allowance also for the privilege of using the waterfall; the evidence is meager upon the subject, and insufficient it is thought to warrant relief.

### Operation and Maintenance Charge.

Prior to July 2, 1917, the date of the "public notice," all expenses for operation and maintenance were charged to construction, and accordingly receipts arising from water rentals or operation charges were applied in reduction of construction cost. An item of $208,827.54, since collected on account of operation and maintenance, appears to be now carried as a reserve for the payment of expenses of operation and maintenance, rather than cost of construction. As I understand, it is not contended by the plaintiff that the settlers will fail to receive the benefit of the item, and it is only a question whether it shall be applied to the reduction of construction cost or in the payment of current and future operation and maintenance expenses, and hence it is a matter of little moment one way or the other. The disposition of it made by the Secretary is not thought to have been unwarranted.

### General Expense.

[1] The plaintiff vigorously assails an aggregate charge of $426,-673.56, made up of a large number of items of a general or miscellaneous character, segregated and classified by the plaintiff's accountant as follows:

| | |
|---|---:|
| General expense, Washington office | $223,425.48 |
| General expense, Chicago office | 19,482.86 |
| General expense, Denver office | 52,337.14 |
| Engineering (Washington) | 8,997.18 |
| Office chief electrical engineer (Washington) | 16,889.77 |
| Consulting engineer (Washington) | 1,955.60 |
| Board of army engineers (Washington) | 1,632.67 |
| Inspection of accounts (Washington) | 2,090.66 |
| Central board of review (1915) | 127.23 |
| Congressional investigation party | 2,529.43 |
| Washington office: Supplies, telegraph, drafting, work, cement inspections, photographic and miscellaneous | 97,205.54 |

$426,673.56

There is no contention that any one of these items is erroneous in fact, but only that as a matter of law they are not chargeable as a part of the cost of construction. In the main, reliance is had upon certain expressions of the Supreme Court in Swigart v. Baker, 229 U. S. 187, 33 Sup. Ct. 645, 57 L. Ed. 1143. The precise question involved in that case was the right of the Secretary to charge and collect the necessary expenses of operation and maintenance so long as he had the management and control of the project system. In discussing it, the

court observed that "the cost of surveying those projects which were not developed and the administrative expenses not chargeable to any particular project might not be repaid, but these sums were so small as to be negligible, as against the fundamental idea of the bill, that the proceeds of public land as a trust fund should be kept intact," and, further, that it was the intent of Congress that the fund is to remain "undiminished by local expenses."

Even if these expressions be regarded as other than dicta, it is difficult to draw the line of demarcation between chargeable and nonchargeable expenses. It could hardly have been intended that the place where the service is rendered, or the obligation incurred, is a controlling consideration. If the accounts of the project are kept in Washington, or if supplies are purchased by an agent in New York, or if specifications are gotten up in Denver, the contribution to the project may be quite as direct and beneficial as it would be, were such services rendered in the immediate vicinity. Neither could it have been intended to decide that to be chargeable the service must be rendered by one who is employed exclusively upon a single project. Upon the other hand, general expense of a strictly administrative character, such as the salaries of the administrative officers and of those who assist them in performing their administrative duties, and all expenses strictly incidental to such performance, would seem to be excluded. In an explanatory note incorporated in the statement, reference is made for details to a statement (Defendant's Exhibit No. 55) gotten out by the project bookkeeper, covering "general expenses (percentage computed on cost)." This shows an aggregate general expense charged against the project of $795,321.16, but such total includes a subtotal for the project office of $483,320.04, the chargeability of which the plaintiff does not question. It will be seen that the remainder does not correspond to the item which the plaintiff assails, but I do not attempt to reconcile the statements of the two accountants. Neither exhibit is sufficiently explicit, nor is the record as a whole definite enough, to enable me intelligently to apply any principle of classification.

The plaintiff offers no serious criticism of the method which was employed in prorating the expenses incurred at other offices to the several projects, in proportion to expenditures thereon, instead of keeping account of and charging specifically for the actual time spent by employees, now upon one project interest and now upon another, and it is assumed that by either method substantially the same end will be reached. That being the case, if in carrying on construction work in different sections of the West the administration at Washington deems it advisable to establish at Chicago a purchasing and transportation agency, the function of which is not administrative, but is to buy and cause to be forwarded necessary equipment, supplies, and materials, I am unable to see why such service for the Boise project should not be charged against construction quite the same as a similar service rendered in the immediate vicinity. So, if the engineering is concentrated at Denver, and at that point necessary engineering work is done for a given project, why should not the expense of such service be considered a part of the construction cost?

But the record fails to furnish sufficient data to enable me to segregate items of this character from items of purely general administration. Of the $426,673.50, testified to by the plaintiff's accountant, $320,631.02 is made up of transfers from the Washington offices. In the statement it is explained that no administration expenses incurred in the office of the Secretary of the Interior were ever charged, and hence there is an implied admission that all expenses of the Reclamation Service offices, whether of a general administrative character or otherwise, were distributed in the manner already explained. But of the $223,425.40, what part was on account of general administration, and what part more directly for project construction? And of the item of $97,205.54, for supplies, drafting, etc., what part contributed directly to the construction of the Boise project, and what part was for general administrative purposes? In short, this issue seems to have been submitted upon the theory that no expense of any character incurred at an office other than the project office is chargeable to project construction, and no attempt has been made to classify the expenditures, or to furnish the data by which they could be classified, upon any other theory. From the record as it stands, therefore, I am unable to see how I can grant relief upon this account.

### Paige & Brinton Claim.

[2] In the statement the following charge is made against the construction cost of the distributive system:

"Contingent liability in suit of contractor in Court of Claims, Paige & Brinton v. United States, $325,931.97."

Paige & Brinton were contractors on the main canal under contract of May 19, 1906, and performed construction work thereunder apparently until 1908. On July 5, 1913, they commenced suit in the Court of Claims, claiming that there was still due under their contract and for damages numerous items aggregating $325,931.97. The case has not been disposed of. Upon no theory am I able to see how this charge can be justified as a whole. I have heretofore found that the understanding was that the Secretary would cause to be constructed and the settlers would pay the actual cost of an irrigation system. But, even if the other view should be taken, namely, that it is the estimated cost, and not the actual cost, and that the Secretary is to make such estimate, I am still unable to see how the charge can be justified. To say that a contingent claim may be estimated at its full value involves a contradiction of terms; such a claim is not contingent. Presumably it is the opinion of the reclamation officials that the claim is invalid, or they would have recognized it and caused it to be paid. If it is invalid, the settlers ought not to be charged with it. If it is valid, the contractors ought to be paid. If its status is uncertain, the settlers ought not to be charged with the full amount thereof. It is a matter of common knowledge that such claims are usually susceptible to compromise and adjustment, and if the settlers are to be charged with a specific amount, the best settlement possible should have been made. Why not give them an opportunity to adjust it, if they are to be held responsible for it?

The government should be fully protected, but not to the unnecessary hurt of the settler. As the case stands, it holds a chance to win one-third of a million of dollars and no chance to lose, and the farmer to lose that amount and to gain nothing. The item alone is a burden upon every acre of land of over $2, or approximately $200 for every farmer with 80 acres. It is not without significance that, while the claim grows out of the construction of the main canal, it was excluded from consideration in making the computation of the amount chargeable to the Notus extension as its part of the construction cost of this feature in which it is to have a share. If the reclamation officials and the plaintiff cannot agree as to the proper amount to be charged on account of the contingent liability, or if a settlement agreeable to all parties cannot be made with the claimants, the full claim should be permitted to stand as a charge only upon condition and with the understanding that, in case the government is successful in defeating it, appropriate credit be given the settlers.

## Acreage.

If, then, the cost is $9,088,825.09 (subject to a possible deduction of $325,931.97 on account of the contingent claim), what is the area to be charged with the repayment thereof? The question has two aspects, and relates as well to the sufficiency of the dedicated capacity of the system as to the propriety of the demanded construction charge. If the acreage is small, the charge must be proportionately large, and the service will be correspondingly good; but if the charge is based upon a small area, and it turns out that a given quantity of water must be distributed over a larger area, the settler will get a poor water right at an excessive cost. The pertinency of these propositions will presently appear. In the public notice of July 2, 1917, all persons interested were advised that under the project water would be furnished for all the irrigable land shown on the "farm unit plats" approved by the Secretary January 26, 1917, and filed in the local land office; such lands being parts of 25 designated townships. At the former hearing it did not become necessary to compute the precise number of acres that were to be irrigated, but all through the trial it was assumed to be between 143,000 and 144,000 acres. The Director of the Reclamation Service and the project manager spoke of the area as being in round numbers 143,000 acres, and it was so stated in the brief of project counsel. And in the Sixteenth Annual Report (1916–17) it was stated that the system was prepared to supply water for 143,856 acres, besides lands which already had a partial vested right.

While a small part of this area was not covered by the public notice, it is doubtless true that at the time it was promulgated the system was in condition to supply 143,856 acres of land, all of which was entitled to purchase water rights, and it was understood by all that such was the area of the project under the constructed unit, exclusive of lands privately owned, having partial water rights. But by the statement it is now sought to reduce the amount as a basis for computing the acreage charge, and also as a basis for the consideration of the sufficiency of the dedicated capacity, to 130,000 acres, without excluding or cutting off certain portions of the residue of the tract from

the right at any time to demand, and receive water. As already noted, what factors were considered or by what method of computation the acreage charge called for by the public notice was reached is in a large measure left to conjecture, and hence, while the plaintiff argues with much show of reason that in the statement some of the factors have been altered to meet the necessity of making a concrete showing of the propriety of the acreage charge, necessarily the considerations advanced are inconclusive. However that may be, the question is only of incidental importance, for the ultimate inquiry relates to the facts as they are, rather than to what they were assumed to be, in preparing either the public notice or the statement.

Under the heading "Irrigable Area," the statement advises us that the "maximum possible irrigable area of new or project lands under the constructed unit [is] about 140,000 acres." How this conclusion is arrived at is not stated, nor is there any explanation of the disappearance of the 3,856 acres constituting the difference between the 140,000 acres and the 143,856 acres announced in the Sixteenth Annual Report. The further estimate is made that, of the 140,000 acres, 40,000 are in the Nampa & Meridian irrigation district and 400 in the Settlers' irrigation district; the residue being in unorganized territory. But formerly the Nampa & Meridian irrigation district had 44,060 acres, instead of 40,000. This appears from the contract of June 1, 1915, between the government and the district, where a total charge was made against the district lands of $3,304,500, which, it is explained, is at the rate of $75 per acre. By virtue of some agreement, or under the terms of the public notice, it seems to be assumed in all quarters that the acreage charge is scaled down to $70, thus reducing the aggregate obligation to $3,084,200. In the statement no reason is assigned for cutting out 4,060 acres of this area, thus reducing the amount to 40,000 acres.

The record being almost silent upon the question, additional testimony was recently taken, for the purpose of clearing up the discrepancy. From this it appears that in accordance with a general practice, prevailing on the project and acquiesced in by all parties, deductions have been made from the acreage provided for in the contract, on account of rights of way for roads, railroads, canals, and drainage ditches, and for irregular pieces lying too high to be reached with water, amounting to approximately 4,500 acres. So that, taking into consideration certain slight additions and changes, it turns out that the estimate in the statement is approximately correct of the district lands. Based largely upon the project manager's testimony, the following analysis of the project acreage is thought to be substantially accurate: Net amount chargeable with water under contract in the Nampa & Meridian irrigation district, 40,346 acres; net amount in the Settlers' irrigation district, 420 acres; lands shown on farm unit plats, under public notice and actually under application or individual contract, 94,624 acres; lands on farm unit plats and under public notice, but not yet covered by water right contracts, 1,323 acres; lands shown upon farm unit plats, but not under public notice, and hence not subject to application, 6,183 acres; total, 142,896 acres.

At this point, as well as any other, it may be explained that the 6,183 acres are as fully project lands and entitled to water as any others, and 60 per cent. thereof is actually under cultivation and is receiving water. It seems that these lands are more sandy and uneven than the average, and as a concession to the owners public notice is temporarily withheld, in order to defer payment of the annual cost installments, which, under the law, begin to accrue as soon as public notice is given. In the meantime water is furnished on the basis of an annual rental charge, but formal applications for permanent rights are not received until public notice is given.

It is further to be added that there are from time to time small increments to the total acreage of the project, due to the fact that there is included in the area of "project lands" only such parts of legal subdivisions as upon survey were found to be susceptible to irrigation by gravity from the ditches as constructed; but from time to time, through changes in laterals or by the use of pumps, farmers are able to reach small additional areas. For example, we are informed by the project manager that between November 1, 1919, and July 31, 1920, from these sources, the area of irrigable and chargeable land on the project was increased in the aggregate amount of 218 acres.

Plaintiff urges that about 584 acres of land in what is called the Walters Butte district, for the irrigation of which the project manager has been leasing waste water, and 1,835 acres of "Bird Reserve" lands, which also receive water under leases from year to year, should be added. But so far as appears there is no purpose to sell permanent water rights to these lands, and such temporary privileges as they enjoy are in subordination to the rights of the settlers upon lands for which the rights are permanent. The revenues derived from the leases are applied in reduction of operation and maintenance expense, and hence the settlers get the full benefit of it.

From the foregoing analysis, which is based upon the records of the project office, as reported by the project manager, one of the defendants, and therefore not questioned by them, it appears that, instead of the "maximum possible irrigable area of new or project lands under the constructed unit [being] about 140,000," it is almost 3,000 acres more, or, accurately speaking, 142,896 acres, net, after making deductions for rights of way of all kinds and high spots. As we have seen, the Reclamation Service is demanding from the project lands generally payment at the rate of $80 an acre on account of construction. Apparently it is intended to charge lands in irrigation districts at the rate of only $70 an acre; but the reasons assigned for making the distinction are not material at the present juncture, and will have later consideration. The theory of the defendants is that, were there no irrigation districts, it would be necessary to charge all lands at the $80 rate, if the government is to be fully reimbursed. But at the $80 rate 113,610 acres, out of the 142,896 acres of irrigable lands, would fully cover the entire cost of the dedicated portions of the system, including $325,931.97 contingent claim which has never been paid. What reasons, then, are put forward for assuming a shrinkage of approximately 29,000 acres, or over 20 per cent. of the entire area?

### Rough and Sandy Lands and Seepage.

[3] In the statement the only explanation applicable to the project as a whole is as follows:

"Estimated area which will ultimately be found unsuitable for irrigation on account of the sandy and rough condition · of certain lands and the seepage of other lands, 10,000 acres."

No reason is perceived why there should be any considerable contingent factor on account of rough or sandy lands. Seepage deductions are in a measure dependent upon changing conditions, but of course lands are as rough and sandy now as they will ever be, and if there are to be any deductions they can as well be and should be made now, and in such a binding way that settlers upon other lands, who are called upon to pay, and do pay, the entire cost of construction, will not later have to share the water to which they thus become entitled with "estimated" sandy lands, which contribute nothing to the cost, but, remaining in the project, and being unidentified, have the same legal footing as all other lands, and may at any time demand their pro rata share of water. If the settlers, who are compelled to pay a proportionately higher charge because of this estimated reduction, later find that the water supply they fully pay for is being distributed to more than the estimated acreage of 130,000 acres, what remedy will they have? They cannot object to delivery to any particular tract, however sandy and rough it may be, for neither in the public notice, nor in the statement, nor in any other record is there any description, particular or general, by which the "estimated" sandy or rough lands, which, for the purpose of fixing the acreage charge it is now assumed will not receive water, can be identified. Such lands, if any there be, can as intelligently be acted upon at the present time as at a later date; and such seems to be the view of the government officers, for by an order dated November 9, 1918, made upon the recommendation of the acting director, the Acting Secretary formally excluded from the project specifically described tracts aggregating 2,039.49 acres.

We have seen that care has been taken to trim the area carried as project lands down to a net irrigable area. High spots have been cut out, and rights of way of all kinds have been eliminated, aggregating a large area, and sandy and rough lands amounting to 2,039.49 acres have been excluded, leaving a net irrigable area of 142,896 acres. Under such conditions it is difficult to believe that there is left any considerable acreage so rough or sandy that it cannot be irrigated, and, it being as easy to determine now as later the extent and description of such lands, if any there are, it would not be just to the paying settlers to subject them to the peril of an "estimate" so indefinite and unnecessary. Accordingly it is thought that an addition to the acreage charge on this account is unwarranted.

We are not advised what part of the 10,000 acres it is estimated will be seeped, and what part is too sandy or rough. Touching the subject of seepage, it seems to be the rule that, where the ground water rises so high in any particular place that it seriously impairs the utility of the land for agricultural purposes, there is a suspension of payments which would otherwise be due on account of the cost charge,

until, by drainage or other means, the condition can be remedied, whereupon the entire charge is collected in due course. Only in cases where the land is permanently swamped, in whole or in part, is there an absolute cancellation or reduction of the charge; but even in such cases apparently payments already made are retained by the government. The rule or practice is general, and applies the same to lands in the irrigation districts as to those outside.

The right of the government to be reasonably protected in some suitable manner against loss from this contingency is, of course, to be conceded. The only question is as to the reasonableness of the estimate or the necessity of imposing upon the settlers so heavy an absolute burden—the actual payment of over $500,000—to meet a mere contingency which may or may not ever happen. Clearly an estimate for permanent seepage of 10,000 acres, or any substantial part thereof, finds no basis in the record. The director, testifying approximately two years ago, referred in an indefinite way, and admittedly without dependable data before him, to the seepage problems upon several other distant projects. It is doubtless true that, with irrigation, not infrequently drainage becomes a necessity, depending very largely upon the geology of the region. That great areas have been irrigated for a generation in this state without the necessity of extensive drainage is a matter of public history; but, be that as it may, the testimony of Mr. Davis, Mr. Hanna, and Mr. Steward is only to the effect that some of the lands are likely to be affected by the rise of ground water, and that a small acreage is already so affected. But no one ventures to assert that any considerable acreage will be permanently seeped or lost to the chargeable acreage. Director Davis was willing to say only that with greater care in the application of water and with drains "there will be some that will still have high ground water." Mr. Hanna, another officer of the service, concludes his discussion by saying:

"As a general rule the major portion of the lands, however, would be reclaimed; but there is no certainty that all of the lands would be reclaimed."

Mr. Steward testified only that the lands in the lower section would become seeped unless they were drained. The channel of the Snake river is in close proximity on one side, and the Boise river on the other, and no geological difficulties are anywhere suggested. The record shows conclusively that drainage systems are both effective and economically feasible. Drains of considerable extent have been constructed by the Reclamation Service, in the main for the older lands having vested water rights, lying between the Boise river and the project lands, but in part for the project lands, and there is no intimation that they are wanting in efficiency. A part of this drainage is for a portion of the project lands embraced in the Nampa & Meridian irrigation district, and though presumably the work was undertaken because the lands were at the time being swamped, now, after the lapse of five years, there are, according to the testimony of the project manager, only 91 acres of seeped lands in the entire area of 40,000 acres, or less than one-fourth of 1 per cent.

It may be that in the voluminous record made up at different hear-

ings, widely separated in time, I have overlooked testimony upon the subject; but outside of a very general statement of Mr. Davis nothing has been called to my attention suggesting the probability of any serious seepage problems in the upper section, and it is quite apparent that it is only upon the lands lying under Deer Flat that drainage to any great extent is likely to become necessary. It was of this tract that Mr. Steward testified, and, as shown on the map identified by him (Exhibit 31), with the exception of a few scattering pieces, all the lands seeped up to the present time, namely, 1,532 acres, are below Deer Flat. The project manager testified that of the aggregate amount 90 per cent. are in that region. While Mr. Steward speaks of the lower half of the project, it is plain that he means the section under Deer Flat, which is only a little more than one-third of the entire area, namely, 51,162 acres. The other lands lie up on benches or mesas, at considerable elevations above the river, whereas the Deer Flat section is more sandy and uneven, and lies closer to the banks of the Boise and Snake rivers. Though apparently having intimate knowledge of all the conditions there, it is significant that Mr. Steward does not intimate a doubt as to the feasibility of effective drainage.

While, as already stated, the government should have adequate protection, the method here employed should be adopted only as a last resort, for admittedly it rests upon a guess. There is no pretension that the "estimate" has any scientific basis or is logically deducible from the facts of experience. What can be said in its support that cannot be said for an "estimate" twice or half as large? To a considerable extent it is necessarily arbitrary, and may result in great injustice. If, as is doubtless the case, it is entirely feasible to prevent the permanent seepage of any considerable area, by the construction of suitable drains, what would be the nature and probable result of this "estimate," if it stands? The settlers would, in the first place, be required to pay the proportionately higher construction charge made necessary by excluding 10,000 acres from the chargeable area, and yet, when drainage is undertaken, as no one can doubt will sooner or later be the case, they must pay their share of the cost thereof; the net result being that they will have paid the full cost of construction and drainage for the water rights they get, plus the cost of an equal water right for 10,000 acres from which they derive no benefit.

Seepage is one of the natural incidents of operating the system, and it would seem to be plain that the necessary expense of providing drainage to prevent damage therefrom is quite as naturally to be covered by revenues collected for operation and maintenance as any other expense to prevent damage from operation. The state law also establishes a legal system for the distribution and collection of the necessary cost of drainage. If there be any doubt as to the practicability of either of these methods of securing such funds as may from time to time be needed, I see no reason why the settlers could not be required, at the time they apply for water rights, expressly to consent to such assessments as may become necessary for the purpose. The plaintiff was organized by the government for the very purpose of

providing a centralized agency to represent the settlers. Under its articles of incorporation and by-laws it was to perform important functions, and by its contract it assumed large obligations. In the earlier history of the project it was recognized and frequently dealt with as such representative and responsible agency. If, when it came to fixing the acreage charge and providing protection to the government to cover the contingency under consideration, it had been consulted, and had declined to give assistance, or to assent to a more equitable method, or were now unwilling to co-operate in providing such protection, perhaps a court should give its objections little consideration. But so far as appears, it was not consulted, and has been and is willing to co-operate and lend its assistance.

It is possible that, before it becomes necessary to enter a formal decree, a plan may be suggested, agreeable to both sides, by which the government can be protected against the contingency of permanent seepage, without the necessity of attempting to find in advance the precise acreage which will be so lost. No reason is perceived why a provision in the water application or contracts obligating the settlers to submit to pro rata assessments from time to time as the need arises, to cover not only necessary drainage, but the unpaid installments of construction cost on the small areas, the reclamation of which is found to be economically impracticable, would not be adequate fully to insure the government against loss, and at the same time be equitable to the settlers. This thought was apparently in the mind of the Secretary when he issued the public notice, for, referring to drainage and distributing works, he therein said:

"The expense of any further work of this kind which may in the future be necessary must be met by the landowners, through an increase of the construction charge herein announced, or otherwise."

### Acreage Charge in Districts and Unorganized Territory.

By section 9 of the public notice of July 2, 1917, the following announcement was made:

"If, within one year from the date of this notice, all of the irrigable lands of the Boise project shown on said farm unit plats are duly pledged in accordance with law and the regulations of the Secretary of the Interior to return the payment of the construction and operation and maintenance charges, either through individual contracts, water users' association contracts, or through irrigation districts duly organized and confirmed by judicial decree, then the said construction charge of $80 per acre will be reduced to $70 per irrigable acre."

While upon analysis it will be observed that this language announces a reduction only in one contingency, that is, that in one way or another all of the lands of the project be brought under water contracts, it seems to have been assumed that, where an irrigation district has been formed and the necessary steps taken under the state law to apportion the benefits to all irrigable land, the land within such district is entitled to the $70 rate. In practice both the officials at Washington and the local project officials have acted upon such assumption relative to the Nampa & Meridian irrigation district, although, as we are now ad-

vised by project counsel, the Secretary has not signed an agreement formally covering the subject, and expressly modifying the original contract stipulation for a $75 rate. But whether this district is or is not entitled to the lower rate is not of present importance. Our concern is with the question whether lands in unorganized territory can be charged an $80 rate.

In view of the provision quoted from the public notice, it must be assumed that the Secretary was of the opinion that, if all of the lands upon the project paid, a rate of $70 an acre would fully reimburse the government; for it will be presumed that he did not knowingly agree to fix an inadequate charge, and the question therefore really is whether he was warranted in adding $10 to cover a possible shrinkage in the paying area because of the failure of some of the lands to apply for water right. Certain aspects of the question were discussed in the original opinion (Payette-Boise Water Users' Ass'n v. Cole, 263 Fed. 734), filed July 21, 1919, but it was left open for further consideration. The following explanation is found in the statement:

"Unless irrigation districts, or some form of organization capable of binding all the lands, should be formed, it will be necessary to depend upon individual applications or contracts, the making of which is largely optional with the individual landowners. Without district organizations binding all lands, it is estimated that a considerable percentage of the landowners will avoid paying the government for a water right by picking up waste water, or securing water in some other way, or holding the land for speculation without irrigation. Consequently it is estimated that a charge of approximately $70 per acre will be necessary if districts are organized and contracts made, binding all irrigable project lands to pay for a water right, and a charge of $80 per acre without such organization; that is, it is estimated that a payment of $70 per acre from all project lands guaranteed by an irrigation district having the taxing power enabling it to assess all the lands would bring in a total revenue or payment equal to the amount which would be collected by a charge of $80 per acre upon such of the project lands as the owners thereof may elect to purchase water rights for."

It is well to recall in this connection that generally there is no distinction between lands in the Nampa & Meridian irrigation district and those upon the outside. In both cases nonirrigable land is excluded from the computation of the irrigable and chargeable area. In the district there is no assessment of benefits upon or charge against rights of way, or high spots, or tracts which for other reasons are not irrigable, and in case of seepage there is a suspension or exclusion, the same as in unorganized territory. The estimate we are considering, therefore, is of a shrinkage in the net area of irrigable land, exclusive of rights of way, high spots, and rough and excessively sandy and seeped areas, and it rests upon the assumption that for one-eighth, or one farm out of every eight, of such net land, no water right applications will be made. Admittedly the land is arid, and without water is of little value, and that for it there is no other legitimate source of water supply. In the statement, as we have seen, it is suggested that some owners would pick up waste water; but the government strenuously asserts its superior right to this water, and not wholly without success. Besides, if valid and sufficient rights can be so acquired by landowners out of the district, similar rights may be acquired within

the district, and lands having valid and sufficient water rights in the district cannot be charged with the cost of an additional right for which they have no need.

It is further suggested that some land may be held for speculation without applying for a water right. It is true there might be unreasonable delay in some instances if the government were without remedy and were bound to hold water rights indefinitely for possible purchase of landowners. But if, exercising its right, the Reclamation Service were to announce that applications would be received only up to a specified date, and that thereafter such rights as remained unsold would be diverted to other purposes, or would be disposed of only at a greatly advanced charge, can anyone believe that a considerable number of holders of arid lands, practically worthless without water, and with no other available source, would fail to make application within the required time? To ask the question is to answer it. And what are the facts of actual experience? According to a statement prepared by the project manager, as of date November 1, 1919, seven days after the statement was signed, there were, exclusive of district lands, 101,912 acres of project lands shown on the farm unit plats. For reasons already explained, 6,183 acres of this amount was temporarily withheld from public notice, and hence from water right applications, leaving 95,729 acres, for which the government is willing to accept applications. Subjecting this amount to the standard of shrinkage relied upon to justify the additional charge of $10 per acre for lands in unorganized territory, only 84,138 acres could be expected ever to apply for a water right; whereas, at the very time it was made, 92,472 acres were actually under applications, and this in face of the fact that controversies had arisen over the terms imposed by the government, and that this suit was pending. In other words, when the statement was made, there were unapplied for only 3,257 acres for which it was possible to make application; and now upon July 31, 1920, 1,934 acres more have come under application, leaving unapplied for only 1,323 acres. And 218 acres of new lands have been added to the irrigable and chargeable area, so that, if no further applications ever came in, the actual net shrinkage is about 1,100 acres, as against an "estimated" shrinkage of approximately 11,000 acres.

It is suggested that, while this is true, it was the right of the director or the Secretary to make an estimate at the time of the public notice, and the mere fact that the estimate turns out to be erroneous is immaterial. But to this there are several answers. In the first place, we have no means of knowing on what considerations the charge fixed in the public notice was based; they have never been disclosed. The statement does not purport to reflect such basis. The estimates therein made appear to be of the date it bears, and, indeed, it expressly modifies the only factor entering into the problem of acreage charge upon which there was any definite commitment in the public notice, namely, the construction cost of Arrowrock. If such an estimate was made at the time of the original notice, it is thought to have been highly excessive in the light of the facts then known, and the actual experience of three years is competent to corroborate that view,

for conditions upon the project during that period have been normal, and such in general as were to be anticipated.

But, aside from these considerations, the public notice is not to be deemed to have such sanctity that it cannot be modified in the interest of justice. Plainly the Secretary does not feel bound by it, for in the statement he has transferred credits approximating $100,000 from the general canal system to Arrowrock, thus reducing the construction cost of that unit, and increasing the construction cost of the balance of the system, to the extent of $100,000, whereby there is imposed upon the settlers on the project lands, if, according to the dedication, they get but one-half of Arrowrock, a net additional burden of $50,000. No criticism of the transfer is intended, for it is apparently just. So a correction of the highly excessive and unjust estimate under consideration should be made. If the public notice is not an insurmountable obstacle in the one case, unfavorable to the settlers, neither should it be in the other, favorable to them.

It is urged that the settlers in the unorganized territory impliedly admit the fairness of the additional charge by failing to form irrigation districts and take advantage of the lower rate. But such an argument is specious. The undertaking of an irrigation district involves many considerations other than the difference in water charge. Some of the settlers might be willing to pay a difference of even more than $10 rather than be subject to some of the burdens which are incident to an irrigation district, but have no relation to the interests of the government. And besides it requires a two-thirds vote of the landowners to form the irrigation district. A majority of the landowners in any given section of unorganized territory may prefer to have an irrigation district, but are powerless to comply with the conditions which the public notice imposes, because they constitute less than two-thirds. It actually turns out that in some cases the owner's holdings are cut in two by the boundary lines of the Nampa & Meridian irrigation district, with the result that for some of his tract he pays $70 and for some of it he must pay $80.

Here, as in the case of the other item of estimated shrinkage, one of two courses may be adopted: Another "estimate" may be made, which in no reasonable view of the facts could exceed 2,500 acres, or the charge could be based upon the acreage actually under contract, with the provision that pro rata credit will be given for such additional contracts as shall be taken within a specified time, which, as to the 6,183 acres, should of course be long enough to give reasonable opportunity to landowners to make application after it is publicly announced that applications will be received. The latter course would seem to be the safer and more equitable, and I am advised of no reason why it should not be followed. It is in principle indistinguishable from the plan of the public notice, for there it was in substance announced that only applications upon the $80 basis would be received, but, if within a year all the lands were pledged, credit would be given at the rate of $10 per acre on all contracts. The details of such a course are left to be worked out in such a way as to entail the least possible inconvenience to either side.

### Has the Plaintiff Any Rights in the One-Half of Arrowrock Storage Withheld from Dedication?

[4] As already indicated, this issue is a new one, for until the statement was filed there was no assurance what parts of the system the Reclamation Service would contend were covered by the cost charge prescribed in the public notice. Notwithstanding an express disavowal from the bench of any intention so to hold, it seems still to be urged for the defendants that in the original opinion it was decided that the Secretary had absolute authority, and that therefore the statement is conclusive, not only upon the government, but upon the settlers and the courts as well. True, it was said in summing up the discussion that—

"The settlers are entitled to have from an authoritative source and of record a declaration of the cost of the project as a whole, and of the portion of which it is intended they shall ultimately become the beneficial owners," and an "authoritative description of said property."

·But, when read in its proper relations, there is no ground for construing this language as a concession of the power of the Secretary to bind the settlers and foreclose inquiry in the courts. To the contrary, both in the discussion and in the recapitulation such authority was expressly denied. By authoritative source reference was had to some one acting with authority to speak for the government, as distinguished from subordinate officials or agencies of the Reclamation Service, to whose acts and words the defendants had repeatedly objected during the course of the trial, as not being binding upon the Secretary or the government. If the settlers accepted and paid the acreage charge fixed by the secretary, upon representations made, not. by him, but by the director, or project manager, or some subordinate officer, that they were to have the entire system, they might later be met with the contention that the Secretary always intended to reserve a portion, and that representations to the contrary were without binding authority. As indicated in another part of the opinion, by authoritative source was meant one having authority "to conclude the government and give reliable and permanent assurance to the settlers."

An irrigation project is not an autocracy. True, in cases where the procedure contemplated by the statute is followed, wide discretion is vested in the Secretary touching the preliminary steps; but even there, when rights have once been regularly initiated, they are protected by law to the same extent as any other rights. Here, as pointed out in the original opinion, the procedural requirements of the act were waived, and the works were constructed upon an understanding, express or implied, that water would be supplied to the project lands, and that those who received water would pay its actual rather than its "estimated" cost. Acting upon such an understanding, the lands were settled upon and improved. If the Secretary has the absolute and unqualified authority now to say what interests such lands shall have in the constructed works, he may deny them any rights whatsoever. Though counsel for the defendants not unnaturally hesitate to recognize such a result, it is necessarily implied from the position taken, and

logically cannot be avoided. Fundamentally, therefore, the question raised by the defendants is whether the settlers have any rights at all which a court can protect and enforce.

### First—The 58,000 Acre Feet Heretofore Sold.

Distinctive considerations apply to the 58,000 acre feet, in the aggregate, of Arrowrock water, which has been sold to 2 canal companies and 7 irrigation districts, only 2 of which, the Pioneer and the Nampa & Meridian irrigation districts, are defendants in this case. It is of course conceded that, in the absence of the 2 companies and the other 5 districts, we can make no decree touching the validity of their contracts. The lands in the 2 defendant districts had such a right as the natural flow of the river affords, and the interests purchased are intended to furnish a supplemental supply for use during the latter part of the season. At first these lands were included in the general scheme of the project, but because of certain developments, explained in the original opinion, later contracts were entered into between the districts, the government, and the plaintiff, by the terms of which they were released from the obligations originally assumed, certain drainage work was to be done, and the districts were to acquire the several interests in Arrowrock now in controversy. By these contracts the plaintiff assented to the arrangements made, and neither it nor its stockholders can now be heard to complain.

It is suggested that because these contracts make reference to the Warren Act, and that act provides for the sale, away from project lands, of only surplus waters, they are to be construed as relating to only such waters as are not needed upon the project lands, and that therefore the rights acquired by the districts are in subordination to the rights of the settlers. But the other terms of the instruments are too explicit and clear in expressing a contrary intent to admit of such an interpretation; and it is to be added that by all parties concerned it was originally understood that these district lands were to receive water. The fact that there was a later modification of the conditions and terms on which it was to be delivered does not materially alter the case so far as the present question is concerned. It still remains true that by the understanding had when the project was undertaken the lands were to be irrigated and were to be on the same footing with those held by the plaintiff's present stockholders. When they were released from the original agreement it was still with the understanding that the system would be called upon for water, and that water would be furnished. If we use the term "project lands" as embracing only government lands enterable under the provisions of the Reclamation Act (Comp. St. §§ 4700–4708), of course these lands are not within the "project"; nor in that sense were they ever project lands. But we are not presently concerned with technical definitions. The uncontroverted fact is that from the inception of the project it has always been understood by all parties that these lands were to receive water, and there is no contention that an undue proportion of the supply has been awarded to them. It is therefore thought that the Secretary has authority under the Reclamation Act to furnish the water, and no right.

of the plaintiff is infringed, because it has always had such understanding and expressly assented to the existing agreements under which the water is to be furnished.

## Second—The 76,000 Acre Feet Still Held.

If, without deciding, we assume that the sales to the other 5 districts and the 2 canal companies are upon the same footing as those to the Pioneer and the Nampa & Meridian districts, and that therefore the amounts so disposed of are no longer available for the project lands, it is still conceded that no outside interests have vested in the reserved 76,000 acre feet, and we are asked to determine the rights of the plaintiff in relation thereto. Manifestly such rights as there are must have their source in some promise or representation made by the Secretary, or result from the facts by operation of law.

While the earlier history of the project—the dealings of the parties with each other, and their agreements, express or implied—discloses a general understanding that the settlers should have substantial rights, and clearly negatives the power of the Secretary to deny them water altogether, it does not expressly or by clear implication precisely define the amount. As before pointed out, the project (using the term in a general sense) has been the subject of growth and transformation. It was originally expected to reclaim a much greater area, and at the outset the water rights were perhaps to a large extent expected to be such as could be supplied by the flood waters of the river, which were thought to be sufficient for crops maturing before the middle of July. Changes were made in the projected system from time to time, and the purpose to irrigate certain lands was abandoned, and as to still others it was at least indefinitely postponed. If read with regard to known conditions existing at the time it was executed, the contract of February 13, 1906, may very properly be construed as evidencing an understanding that water rights should be reasonably adequate. Section 10 of article 2 of the plaintiff's by-laws, which are referred to and made a part of the contract, clearly implies such an understanding. But of course it was not understood that a full seasonal adequacy was guaranteed, for, though storage was even at that time contemplated, there was as yet no definite plan for storage facilities. The discovery of the Arrowrock site and the undertaking at that point gave assurance of a reasonably adequate seasonal supply.

While the Arrowrock reservoir was decided upon after the contract of 1906 was entered into, and in relation to it there is no special supplemental agreement, the record leaves little room for doubt that upon both sides, at all times after it was undertaken, it was understood to be an integral part of the system, and was to be regarded as falling within the general terms of the contract, the same as any other unit of the system. That such was its status seems always to have been assumed, at least until after the public notice was given and this controversy arose. The settlers expected to have the benefit of the stored waters, and the reclamation officials expected to charge them with their proper share of the cost of constructing the dam, the same as in the case of any other feature. In fixing the acreage charge and making up the public notice it was included as a matter of course, and in all respects

269 F.—12

treated the same as if it had been in contemplation when the original contract was executed. In his original brief project counsel argued strenuously for such an understanding, and urged that in the light of the circumstances it would be a fraud upon the government to relieve the settlers from the obligation to pay for that which they had encouraged the Reclamation Service to build, with the implied promise upon their part that they would reimburse the government for its necessary outlay.

It seems now to be the position of counsel that the plaintiff's stockholders and other settlers have no right to demand any stored water, and that whatever the Secretary apportions to them is a matter of grace, and that any action he may take in the premises is not subject to review in the courts. Suppose that the situation here presented were reversed, and that the plaintiff and the settlers, content with the natural flow of the river, were declining to take any of the Arrowrock water, or to pay any part of the cost of constructing the dam, and in support of such position were contending, as the defendants now contend, that the expenditures were not contemplated when the 1906 contract was executed, and that therefore they are under no obligation in the premises; and suppose, further, that a considerable portion of the reservoir capacity could not be utilized for any other irrigable lands, and that therefore there would be no source from which the government could get back a large part of its expenditures—can it be imagined that the Secretary would for a moment acquiesce in such view? Would he not rather say, as was urged by the defendants in their original brief, that by reason of what has occurred, and the conditions under which the dam has been constructed, and the dealings between the parties, and the common understanding which has prevailed, the obligation to take stored water and to pay for its cost is upon precisely the same footing as the obligation touching the river flow and the cost of constructing the distributing system? In the light of all of the circumstances, it is thought that this is the only reasonable view that can be taken.

### Is One-Half of Arrowrock Storage Reasonably Sufficient for the Project Lands?

If, then, having in mind the limitations of the system, the understanding has been that the settlers would receive water rights reasonably sufficient for the proper irrigation of their lands, will those portions of the system set apart and dedicated by the Secretary supply the requisite amount of water? The lands naturally fall into two general sections, the upper and the lower. In the upper, embracing about two-thirds of the entire area, or, accurately speaking, 91,734 acres, the texture of the soil ranges from fine to medium, and in the lower section, comprising the other one-third, or 51,162 acres, from medium to extremely coarse and sandy. In ordinary years the natural flow of the river is ample until the early part of July, gradually declines until the latter part of July, and from that time on storage water is the only resource of the system. Deer Flat reservoir is available to the lower, and only the lower, section, and Arrowrock reservoir exclusively for

the upper. The effective storage capacity of Arrowrock is 268,000 acre feet, one-half of which amount is, under the statement, dedicated to the project lands, and hence the specific question is whether 134,000 acre feet, measured at the dam, is sufficient, after deducting transmission losses, to irrigate the upper section, or 91,734 acres, during the latter part of the irrigation season, from some time in July until October.

The question involves the consideration, not only of the reasonable duty of water at the land for that period, but also necessary transmission losses. What duty the Secretary adopted in making up the statement is not clearly disclosed. As has been observed, the language employed in the contract of 1906 is of a very general character, and furnishes no definite measure, for "proper duty," "beneficial use," and "sufficient to properly irrigate" are terms of relative import, and convey no fixed or specific meaning. The general language, it is contended by both sides, has been measurably defined by the statements and admissions of the parties and by established practice, expressing or implying an understanding, or at least a concession, as to the specific amount of water to be supplied. But in one point only can it be said the record is entirely clear: The defendants plead and show that in the Annual Reports for 1907 and 1908 the duty of water was announced as 4 acre feet, measured at the canal headgate, and that in the reports from 1912 to 1915, inclusive, and also in a circular of information, all put out after the Arrowrock reservoir was undertaken, as 2½ acre feet "at the farm." In their answer, after pleading that the duty of water was so "determined, announced, and established" by the Secretary, they allege that—

"Throughout the entire time that the Boise project was under construction the plaintiff and its shareholders acquiesced and concurred in and agreed to the said established duty of water of 2½ acre feet at the land, or 4 acre feet at the head of the canal, and never offered any objection thereto until the filing of this cause of action, but allowed the United States to proceed with the construction of the said project, and to spend over $12,000,000 thereon in reliance upon the said established duty of water, and plaintiff is estopped thereby."

The pleading is thus a plain concession that the Secretary has held out and given the settlers to understand that the water available for them will be at the rate of 2½ acre feet at the land, or, its equivalent, 4 acre feet measured at the head of the canal. Whether the plaintiff or the settlers have assented to such a duty, or by their silence and nonaction are estopped, is not so clear. Upon that point the defendants further allege and show that during the years 1913, 1914, and 1915 about 400 applications for stock in the plaintiff company were made to and accepted by it, upon forms provided by the Reclamation Service, in which the duty of water was defined to be 2½ acre feet per acre, measured at the land, subject, of course, to the limitation of maximum need for beneficial use. By themselves these facts strongly imply a mutual understanding that this was to be the measure of the right.

In rebuttal, however, the plaintiff shows that the later applications, of which there were approximately 1200, were on a form, also prescribed by the Reclamation Service, in which there was no provision for a specific amount of water. It also points out that in actual prac-

tice throughout the period during which the Arrowrock reservoir has been in service the delivery has greatly exceeded 2½ acre feet, and, further, that in certain computations made by project officers and probably considered by the Secretary before the public notice was given, a much larger duty was assumed for all except a small percentage of the acreage, and that in the defendants' answer, prepared and verified by project counsel, who apparently participated in the preparation of the statement, if not the public notice, there are averments to the effect that under the dedication as defined in the statement 3½ acre feet will be available at the land (including, of course, the natural flow as well as storage), from which it is argued the inference must be drawn that the Secretary considered that quantity to be reasonably necessary, for, otherwise, presumably he would not have made the dedication. Admittedly 2½ acre feet is entirely inadequate for what might be classified as "sandy" lands; those which are extremely sandy will apparently require at least twice that quantity, and it was for that reason, as we have seen, the Secretary has actually excluded about 2,000 acres from the original tract. However, most of the "sandy" lands are in the lower section, and hence are not directly involved in the question.

If, in harmony with defendants' pleading, we assume, without deciding, that the duty of 4 acre feet at the intake, or 2½ acre feet at the land, has been mutually agreed upon, is one-half of the Arrowrock storage sufficient to meet the requirement? It will, of course, be assumed that the intention was to deliver the water at such times during the season as there should be need. The right cannot be satisfied by the delivery of an excessive quantity during the early part of the season and little or none during the latter part. Surely the officers of the Reclamation Service never thought that 2½ acre feet would be required during the high-water season alone, or that that amount could be beneficially applied during such period. While specifically the reservoir at Arrowrock was a later development, storage facilities were contemplated at least as early as 1906. In the Fifth Annual Report of the Reclamation Service (1906) it is said:

"The water supply for this [Boise] project will be obtained from Payette and Boise rivers, the natural discharge of both streams to be regulated by reservoirs. * * * Storage will be developed at two points on the Boise river; one on the North fork; the other on the Middle fork. The flood discharge of these streams occurs during May and June, and furnishes an adequate supply of water for all grain crops. It is believed that sufficient storage can be developed to provide enough water for the acreage that will require late irrigation."

That was apparently the understanding of the parties when the original contract was entered into, and accordingly it contains this recital:

"Whereas, the lands embraced in the area proposed to be irrigated * * * are naturally desert, * * * and will to a greater or less extent remain unreclaimed * * * unless the waters of Boise and Payette rivers * * * be impounded," etc.

In the Twelfth Annual Report (selected at random), published after the Arrowrock dam had been undertaken, these statements are found (page 85):

"Length of irrigation season: From April 1 to October 31—214 days."
"Duty of water, 2½ acre feet per acre per annum at the farm."

But the point does not require extended consideration. It is too clear for discussion that in fixing the duty of water at 2½ acre feet it. was understood that the delivery would be throughout the irrigation season, at such times as there was need. Expressions relied upon by the defendants to the effect that flood waters would be substantially the only resource for the system are found mainly in the preliminary or very early reports.

Apparently prior to the commencement of this suit, at least, it was the opinion of the reclamation officials that the natural flow of the stream is ordinarily sufficient only up to the 1st of July. Quotations have already been made from the Fifth Annual Report expressing such a view, and in the public notice of July 2, 1917 (section 10) the "flood season" is defined as ending June 30th, and the "storage season" as commencing July 1st, for the New York Canal lands, which have a "natural flow" right superior to that of the project lands. Under the evidence, however, I am inclined to think that upon the average the high water holds up a little longer. For four years (1916–1919) water was first drawn from the Arrowrock reservoir about July 14, 1916, July 12, 1917, June 27, 1918, and June 12, 1919. Admittedly 1919 was an abnormal year. According to the testimony of Mr. Hanna, the project records show that upon the average, during the period from 1896 to 1919, the river discharge was sufficient to cover all rights, including those of the project, up to July 2d, and ceased to be available in any amount for the project on July 28th. Assuming that the fall from July 2d to July 28th is practically uniform, it may be said that the natural flow is adequate until July 15th, and thereafter dependence is exclusively on the storage water, or for one-half of the 214 days, which, as we have seen, the Reclamation Service recognized as the irrigation season, extending from April 1st to October 31st. Where there is a considerable acreage of grains, the irrigated area during this part of the season will not average as high as that for the earlier period; but, upon the other hand, the precipitation is less and the temperature higher. There were put in evidence some estimates of the monthly requirements, one of which is based upon the actual experience of the project, and this is as follows:

"For April, 8 per cent. of the season's supply; May, 16 per cent.; June, 19 per cent.; July, 23 per cent.; August, 20 per cent.; September, 12 per cent.; and October, 2 per cent."

This finds substantial confirmation in the testimony of Mr. Tallman, who has had wide experience in the use of water in the valley, and in the light of common knowledge, the estimate appearing to be reasonable, it may be accepted as approximately correct. Accordingly it is held that, under a seasonal duty of 2½ acre feet, there should be a delivery of approximately 1.14 acre feet of storage water, measured at the lands.

The Reclamation Service has apparently estimated the transmission loss to be 37.5 per cent., for in some of the annual reports the duty is stated to be 2½ acre feet at the land, and in others 4 acre feet at the

head of the main canal; and, as we have seen, in their answer the defendants impliedly concede that the one measure is equivalent to the other    I find in the record no estimate of the river loss, in transmission from the reservoir to the head of the canal; but, taking into consideration the fact that the canal beds are saturated before delivery of storage water begins, and making a small allowance for river loss, 37.5 per cent. may be taken as a fair estimate of the entire transmission loss. It follows that, of the 134,000 acre feet which under the statement is available at the reservoir, only 62.5 per cent., or 83,750 acre feet, can be delivered at the lands, or enough at the rate of 1.14 acre feet per acre for approximately 73,500 acres, whereas the actual acreage requiring water will, as we have seen, be approximately 91,734 acres. If we allow a shrinkage in this acreage of 734 acres, which is probably in excess of the amount at the present time not under actual contract, and make provision for only 91,000 acres, under the duty of 2½ acre feet at the land for which defendants contend, the required amount at Arrowrock dam would be approximately 166,000 acre feet, or 32,000 feet more than is provided for in the dedication. It would therefore seem to be clear that upon the defendants' theory the settlers are entitled to this additional capacity in the reservoir.

Unless we accept this theory, it must be held that no specific amount has been agreed upon, and any adjudication of the issues will involve a finding as to the duty of water; for if the plaintiff rests upon the general understanding that its members should have a reasonably adequate supply it will be necessary to determine what is such a supply, and, upon the other hand, if it relies upon the legal theory that the Secretary has the authority to sell or otherwise dispose of only "surplus" water—such as is not required for the project lands—the question is substantially the same. But the courts ought not to be called upon to make such determination until there is a clear necessity therefor; and such necessity does not presently exist. In the statement the Secretary makes the following announcement:

"If the members of the Payette-Boise Water Users' Association desire a larger proportion of the Arrowrock reservoir and are willing to pay for the same, an application to purchase a right to the use of additional capacity out of the reservoir will be considered, if an acceptable application for the same is made prior to the sale or dedication of the water to other lands."

While it may be thought that, in harmony with the earlier practice touching matters of interest to the settlers, the plaintiff should have been consulted before definite action was taken, either in announcing the acreage charge or making the "dedication," the order or mode of procedure is not to be regarded as a substantive right. The Secretary's offer is conditional, it is true; but it may be that, upon proper representations from the plaintiff, he will concede to it substantially what it here seeks. Nor by making such application or claim need it waive any right. If it feels that it has not received all that justly belongs to it, no reason is perceived why it may not, without prejudice, seek to have the mistake corrected. Were its rights in the premises specifically defined, perhaps a different view might be taken. But it is to be borne in mind that within a certain range intelligent men may differ as to the proper duty of water, and had the Secretary dedicated to the project

lands the whole of Arrowrock, and hence charged against them its entire cost, it is possible that some of the plaintiff's members would have complained that both the right and the incident burden were excessive.

It may be conceded that by standards which have heretofore been generally recognized in the state 2½ acre feet represents an extremely high duty, and that with that amount the settlers cannot take full advantage of the long growing season prevailing in the Boise Valley, but must be content with the production of such crops upon a large proportion of the acreage as may be grown with equal success under the less favorable conditions prevailing in the higher altitudes. Upon the other hand, it is also to be admitted that, while not abundant or fully adequate, 2½ acre feet is a substantial supply, and will insure against the tragedies which are altogether too common upon projects where there is no reasonable relation between the water supply and the acreage to be irrigated. Numerous factors are involved in the problem of the duty of water, including considerations of economic policy as well as the requirements of plant growth and unavoidable percolation losses, necessarily great even under the most favorable conditions. Where, therefore, by virtue of an agreement or under the law there is on the one hand the obligation to supply and upon the other the reciprocal right to receive such amount of water as is reasonably necessary, the question between the parties is peculiarly one for fair consideration and discussion, with a view to an amicable agreement as to the specific amount to be furnished, and while the courts will not decline a real controversy, neither will they anticipate one before it actually arises.

To summarize upon this branch of the case, the parties have, in general terms, at least, agreed upon the amount of water to be supplied and received, and that agreement the courts may, and when there is need should, interpret and enforce, but such need has not yet arisen.